UNITED STATES, Appellee

v.

GEORGE H. RHODES, First Lieutenant, U. S. Army, Appellant

3 USCMA 73, 11 CMR 73

No. 1809

Decided July 17, 1953

Samuel T. Ansell, Jr., Esq., and LT COL James C. Hamilton, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, LT COL Thayer Chapman, U. S. Army, CAPT Irvin M. Kent, U. S. Army, and 1ST LT Robert A. Forman, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

A general court-martial convened at Pusan, Korea, convicted the accused, an Army lieutenant, of "black market" activities contrary to the provisions of certain standing orders, and additionally of conspiracy to violate the same orders, the former offense proscribed by Article of War 96, 10 USC § 1568, and the latter by Article of War 95, 10 USC § 1567.[1] In view of the character of the questions now raised, it is unnecessary to set out in detail the specific activities charged against the accused. The convening authority—with exceptions not pertinent here—approved the conviction. Following affirmance by a board of review, this Court granted a petition by Rhodes for consideration here as to the matters dealt with below.

II

The principal argument of the accused is based on the fact that a diary belonging to him was extracted from his desk—and in his absence—allegedly through an illegal search and seizure. Information reflected in this diary led to the identification and location of witnesses whose testimony subsequently established the existence of the illegal activities carried on by the accused, and for which he has been convicted.

At the time of the search and seizure in question, the accused was assigned as Assistant Claims Officer in the office of a Captain Robert W. Meltz. The latter was designated Judge Advocate for the 7th Transportation Medium Port, a staff position under the command of one Stanton, an Army colonel. From an informer, the Criminal Investigation Division had received advice that the accused was engaged in illegal import transactions, and that relevant information concerning the facts and extent of this misconduct could be secured from a diary kept by the latter, and normally contained in a manila envelope in or on his office desk. Agents of the Division sought out accused's superior, the Captain Meltz mentioned earlier, disclosed to him the nature of their information, and requested that he capture the diary from accused's desk. As noted earlier, Rhodes was absent at the time. Captain Meltz complied with this request of the law enforcement authorities, and delivered to them the diary found in the desk of the accused. They retained the diary for several days, made photostatic copies of appropriate portions of it, and, without accused's knowledge, returned it to the place from which it had come.

Did this search of accused's desk and later caption of the diary constitute an illegal search and seizure? We do not hesitate to respond in the negative. The present subject has produced a wealth of civilian judicial authority. In addition, it has received the attention of this Court in three cases thus far in the tribunal's history. United States v. Doyle (No. 265), 1 USCMA 545, 4 CMR 137, decided May 20, 1952; United States v. Florence (No. 207), 1 USCMA 620, 5 CMR 48, decided August 26, 1952; United States v. Dupree (No. 364), 1 USCMA 665, 5 CMR 93, decided September 9, 1952. In the Doyle and Florence cases, supra, we recognized the well-settled military rule that a commanding officer possesses authority to make or to order an inspection or search of personnel and property under his control. That rule is expressly embodied in the Manual for Courts-Martial, United States, 1951, paragraph 152, which also provides that one who is an "officer in charge" is a "command-

---

[1] Since the offenses charged were alleged to have been committed prior to May 31, 1951, the effective date of the Uniform Code of Military Justice, the charges were laid under Articles of War. The trial having been held after May 31, 1951, was subject to the provisions of the Uniform Code of Military Justice and the Manual for Courts-Martial, United States, 1951.

'ing officer" within the meaning of the paragraph. The Doyle case also made clear that this authority may be delegated, and the same rule is announced in paragraph 152 of the Manual, supra. Finally in Doyle it was recognized that in the military service certain persons other than commanding officers—depending on their official positions and responsibilities—possess inherent power to conduct searches on military installations or of property within military control. Paragraph 152 of the Manual, supra, likewise recognizes expressly that legal searches may be effected by persons other than commanding officers so long as such searches are "made in accordance with military custom." It should be noted that the board of review found the search and seizure here to be in entire accord with "military custom."

In this particular case, there is no doubt that the officer who conducted the search, Captain Meltz, was not a "commanding officer" in the usual and strict sense. We need not determine here whether the position he occupied falls within the designation, "officer in charge", as used in paragraph 152 of the Manual, supra. The office desk, the object searched, was military property safely within the ambit of the direct responsibility of the officer who conducted the search. The latter was the superior officer of the accused. He had been informed reliably and officially that there was good reason to believe that the accused was engaged in an unlawful enterprise. Indeed, had Captain Meltz taken no action after having received intelligence of the accused's alleged misconduct, disciplinary proceedings might properly have lain against him. It is quite true, of course, that the Captain could have elected to report the matter to his commanding officer, Colonel Stanton, and to have requested authority to effect the search in fact made. However, in our opinion, he was not required to follow this latter course. The search was in no sense general and exploratory, but instead was narrowly restricted in scope, purpose, and physical area. It was, therefore—under all of the circumstances, including the exigencies of the military service—entirely reasonable. As we stated expressly in Doyle: "In applying the rule of exclusion, the fundamental inquiry must . . . be in every instance whether the search involved is unreasonable." As the search was not, under the facts involved here, unreasonable, it was not unlawful.

We are not at all to be understood as laying down the broad rule that any military person possesses inherent authority to search the effects of another who is his subordinate in rank or grade. In this field of the law, as in so many others, general propositions are apt to be illusory—for the question in each case depends so completely on the setting in which it is found. Our determination here must be evaluated in the light of the peculiar facts of the case before us now.

### III

The accused contends further that the search and seizure here was unlawful because the diary secured constituted *evidence* of crime merely, and *not* the fruits or the instrumentality thereof. The premise for this argument is, of course, that the diary falls within that class of property which can never be made the subject of a lawful search and seizure. That there is such a category—customarily characterized as "mere evidentiary materials"—is firmly recognized. Harris v. United States, 331 US 145, 154, 91 L ed 1399, 67 S Ct 1098; United States v. Rabinowitz, 339 US 56, 64 (fn 6), 94 L ed 653, 70 S Ct 430. However, the doctrine's boundary lines are not clear, but are shadowy, indistinct, and elusive indeed. Gouled v. United States, 255 US 298, 65 L ed 647, 41 S Ct 261; Marron v. United States, 275 US 192, 72 L ed 231, 48 S Ct 74; Go-Bart Importing Co. v. United States, 282 US 344, 75 L ed 374, 51 S Ct 153; Sayers v. United States, 2 F2d 146, 147 (CA 9th Cir); Kirvin v. United States, 5 F2d 282, 285 (CA2d Cir); United States v. Kirschenblatt, 16 F2d 202, 204 (CA2d Cir). It is not necessary in the instant case to explore the matter at length, nor—for reasons which will shortly become apparent—are we required to determine whether

the Fourth Amendment to the Federal Constitution applies with full force and effect to the military establishment. Here, it is quite clear that the diary of the accused constituted in fact his means—quite apparently his only means—of preserving the records of his nefarious activities, although not in customary business form. It is, of course, the substance of the diary which must control. Viewed substantively, the diary was as much a part of the accused's unlawful undertakings as were the ledger and bills of the prohibition law violator held subject to seizure in Marron v. United States, supra; see also United States v. Lindenfeld, 142 F2d 829 (CA2d Cir). Accordingly, this branch of accused's argument must fail. We hold, therefore, that the search and seizure questioned here was entirely lawful, and that no error tainted the receipt of its product in evidence.

## IV

Additionally, appellate defense counsel assigns as error the admission in evidence of Prosecution █ Exhibits 10 through 16, which were received as carbon copies of longhand letters—including signatures—sent by accused to one Armstrong, a co-conspirator situated in Japan. These letters were taken from accused at a time after the seizure of the diary. Armstrong, from the witness stand, related that he had destroyed all correspondence from the accused, but satisfactorily identified the copies offered by the prosecution, from their contents, as copies of letters received by him from the accused. The latter contends that it was error to receive such "secondary" evidence of the content of the letters. However, the short answer to this position is that these Exhibits, as carbon copies, and "as complete as the original in all essen-

tial respects, including relevant signatures," are not secondary evidence at all, but are considered to be duplicate originals and equally as admissible as originals. Manual, supra, paragraph 143a (1) ; United States v. Jewson (No. 532), 1 USCMA 652, 5 CMR 80, decided August 29, 1952. The exhibits were sufficiently authenticated by the witness, Armstrong, and were properly received in evidence as duplicate originals.

However, assuming the letters to Armstrong to be "secondary" evidence, we remain of the opinion █ that no error was committed in receiving them. The Manual, supra, provides in paragraph 143a (2) that such evidence is admissible if it is shown that the original "has been lost or destroyed, or that for some other reason it cannot be produced." This rule appears to be broader in scope than the civilian Federal rule, which is said to exclude secondary evidence if the original was destroyed by the proponent for a reason other than accident or mistake. See Riggs v. Tayloe, 22 US 483, 6 L ed 140. However, conceding arguendo that the military rule in this area is identical with that laid down by Federal civilian authorities, our conclusion is unchanged. The originals in question here were destroyed for his own purposes by Armstrong, a co-conspirator with stronger self-protective promptings than those manifested by the accused. They were not made away with by the Government. The Government was the proponent of the carbon copies, not Armstrong. The latter was a mere witness, and, as we have seen, a co-conspirator.

No error appearing, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.