UNITED STATES, Appellee

v.

THOMAS D. MARRELLI, Airman Third Class,
U. S. Air Force, Appellant

4 USCMA 276, 15 CMR 276

278.

279

No. 3332

Decided May 14, 1954

 

COL Kenneth B. Chase, USAF, COL A. W. Tolen, USAF, and MAJ Norman F. Carroll, USAF, for Appellant.

LT COL Harold Anderson, USAF, and 1ST LT Anthony Ortega, Jr., USAF, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Marrelli, was found guilty, following trial by an Air Force general court-martial, under specifications alleging a brief unauthorized absence, together with six larcenies of money and merchandise, in violation of the Uniform Code of Military Justice, Articles 86 and 121, 50 USC §§ 680, 715, respectively. Following approval of the findings and sentence by the convening authority, and affirming action by a board in the office of The Judge Advocate General, the accused petitioned this Court for review. We granted that we might consider the admissibility in evidence of various photostats, the reception of which at the trial is believed by the accused to have trenched on the attorney-client privilege. See Manual for Courts-Martial, United States, 1951, paragraph 151b (2).

II

The prosecution sought to establish that, during a three or four day period in mid-October 1952, the accused had made numerous purchases from merchants in Panama City, Florida—a town situated near Tyndall Air Force Base, from which station he was absent without leave at the time. Evidence indicated that the merchandise in question had been secured through the use of checks, equalling or exceeding in amount the price of the goods bought, and drawn on the accused's account with the Bay National Bank of Panama City. Unhappily these checks were uttered at a time when this account was so depleted that they would not have been paid in due course. Moreover, it was readily inferable that the accused knew that the bank would not have paid the checks on presentment. Accordingly—so far as this aspect of the case is concerned—the court-martial was free to conclude that the accused had obtained, through a false pretense, the merchandise and money in return for which the checks had been issued, and thus that he was guilty of "larceny by check." See Manual for Courts-Martial, supra, paragraph 200a (5).

The accused was identified specifically as the person who had uttered certain of the checks which the Government contended were the instrumentalities by which the larcenies were committed. Apparently, however, he could not be linked by eyewitness testimony to the utterance of the remaining ones—possibly because of the lapse of time between the alleged offenses and the trial. As a consequence, trial counsel sought to rely on handwriting testimony to establish that the checks in question had been issued by the accused. As a basis for handwriting comparison, the Government tendered in evidence photostats of all of the checks alleged to have

**280**

been issued fraudulently by him. To the reception of these documents defense counsel objected strenuously, and the accused himself assumed the stand for the limited purpose of showing that the check photostats had been secured improperly.

The testimony of the accused and that from other witnesses revealed that, following dishonor of the checks and their return to the payee merchants, they had been paid by a Mr. Alto Johnson, a Panama City attorney, who took possession of them. This lawyer seems to have been compensated by the accused's mother, but the accused testified that he had retained Mr. Johnson. Whether by this assertion he meant only that he had recommended to his mother that she secure Mr. Johnson's aid, or, instead, that he had negotiated personally for the services rendered, was not made clear. In any event, the attorney did not appear at the court-martial, either as a witness or as counsel for the accused, who was defended by military counsel alone. In fact, it seems quite probable that the civilian lawyer's efforts related primarily to a practical attempt to forestall criminal proceedings against the accused in the Florida courts.

Following payment of the dishonored checks, and Mr. Johnson's succession to their possession, he was visited in his Panama City law offices by Lieutenant Herman J. Smith, the accused's squadron commander. According to Lieutenant Smith, he requested of Mr. Johnson temporary possession of the checks, and the latter relinquished them to him "voluntarily" for a sufficient period to permit reproduction by photostat. The motive for the delivery of the checks does not appear clearly from the record, and was doubtless undiscoverable in the absence of appearance of the attorney as a witness. The accused denied that he had at any time granted the latter authority to deliver to any person documents belonging to him. Unless the law officer erred in ruling that the photostats were admissible in evidence, the court-martial was provided with an adequate predicate for determining that it was the accused, and no other, who had uttered all of the checks in issue at the trial.

## III

The attorney-client privilege, on which defense counsel places great reliance, we consider to be inapplicable. This privilege—one of the oldest and soundest known to the common law—exists for the purpose of providing a client with assurances that he may disclose all relevant facts to his attorney safe from fear that his confidences will return to haunt him. Wigmore, Evidence, 3d ed, § 2291. Unless the client is accorded such protection as a foundation for the establishment of rapport with his attorney, the latter will be unable in many instances to secure all of the information essential to the rendition of legal services—for without knowledge of the facts a lawyer cannot properly perform his role in representing his client and in effecting a satisfactory disposition of disputes and difficulties. However, the fact that one is acting as an attorney for a party to litigation does not render him incompetent as a witness. His lips must remain sealed only as to those matters which fall within the purpose and policy underlying the lawyer-client privilege. Modern Woodmen of America v. Watkins, 132 F2d 352 (CA 5th Cir).

Some jurists, indeed, have remarked that the lawyer-client privilege must be confined to its narrowest limits. See Prichard v. United States, 181 F2d 326 (CA 6th Cir), affirmed 339 US 974; United States v. United Shoe Machinery Corporation, 89 F Supp 357 (DC Mass). To these statements we must agree, if they be interpreted to mean—as in the case of other exclusionary rules which operate to deprive the trier of fact of material evidence—that the exclusion of relevant evidence must not exceed in scope the policy it is designed to serve. Indeed, the concept that the privilege before us now should be applied strictly in terms of its underlying policy, serves to explain the rule that an attorney may be compelled to testify concerning a client confidence

**281**

received in connection with a *projected* crime. See, e.g., A. B. Dick Co. v. Marr, 95 F Supp 83 (DC NY); Wigmore, supra, §§ 2298–9; Manual, supra, paragraph 151*b*(2). The social interest favoring full disclosure by clients to attorneys is inoperative to shield with secrecy confidences made for the purpose of seeking legal advice as to how best to commit a contemplated offense. Similarly the privilege has no application to a communication made before persons whose presence was in no wise essential to a proper performance of the attorney's function. See, e.g., Bryan v. Barnett, 205 Ga 94, 52 SE2d 613; Fuller v. State, 34 Ala App 211, 39 So2d 24, cert den, 39 So2d 29; Vance v. State, 190 Tenn 521, 230 SW2d 987, cert den 339 US 988; Wigmore, supra, § 2311.

Dean Wigmore has explained the attorney-client privilege in terms of the following criteria:

"(1) *Where legal advice of any kind is sought* (2) *from a professional legal adviser in his capacity as such,* (3) *the communications relating to that purpose,* (4) *made in confidence* (5) *by the client,* (6) *are at his instance permanently protected* (7) *from disclosure by himself or by the legal adviser,* (8) *except the protection be waived.*" [Wigmore, supra, § 2292. Prichard v. United States, supra; Palatini v. Sarian, 15 NJ Super 34, 83 A2d 24.]

We shall proceed to consider the instant case in light of certain of these requirements for the existence of the privilege. At the outset it is to be observed that throughout this opinion we accept arguendo the assumption that Mr. Johnson was the *accused's* agent, although compensated by his mother. We believe, too, that the privilege, if any, was in no way impaired by the circumstance that Mr. Johnson's activities in the accused's behalf were not shown to have been related to military charges against him, nor by the fact that the attorney was not engaged to defend him at the court-martial trial. Cf. Wigmore, supra, §§ 2294–5, 2300,

Moreover, we deem it appropriate to indicate our acceptance of the Wigmore view that the attorney-client privilege may not be defeated by an attorney's voluntary divulgence of facts or documents to an opposing party, which disclosure was beyond his authority—express or implied—from the client. Wigmore, supra, § 2325. Accordingly, had we considered the lawyer-client privilege to be applicable within the context of this case, and had we regarded the delivery of the checks to Lieutenant Smith as beyond the scope of Johnson's authority, we should have been compelled to hold the photostats inadmissible in evidence. Conceivably, it may be argued that a client must assume the risk of disloyalty on the part of an attorney whom he freely chose to represent him. However, we recognize no reason for rewarding perfidious conduct on the part of a faithless attorney, and we believe the contrary view to be demanded if the privilege is to receive adequate protection.

Returning to the eight canons of the privilege, we cannot perceive how dishonored checks uttered by the accused to Panama City merchants may qualify as communications related to the purpose of securing legal advice or services from an attorney. Of course, utterance of the checks did involve representations—and thus communications. Indeed, it was these representations which were the basis of the prosecution's insistence that the accused had utilized "false pretenses" in obtaining the money and property specified. However, the communications made were in no way directed to the lawyer, whose services had not been retained. In fact, had Mr. Johnson been representing the accused at the time of, and with respect to, the utterance of the checks, it is conceivable that the lawyer-client privilege might not have come into operation because of the exception as to contemplated criminal offenses. Not having been brought into existence as communications to an attorney, and having antedated the establishment of any possible attorney-client relation, the checks acquired by Mr. Johnson on the

accused's behalf were not documents falling within the scope of the lawyer-client privilege. Palatini v. Sarian, supra; Wigmore, supra, §§ 2307–8, 2318; 59 Am Jur, Witnesses, §§ 499–501. Nor was the requisite element of confidentiality present in the issuance of the checks by the accused. Delivery of a check to the payee permits negotiation through the hands of unnumbered indorsers before presentment to the drawee bank—and certainly it is not unforeseeable that such negotiation will occur. This prospect of negotiation of the checks in suit seems to us to constitute the very antithesis of confidentiality—with the result that we can scarcely consider that payment and acquisition of the checks by Mr. Johnson brought into play the attorney-client privilege.

The prerequisite that the communication be made by the client is unfulfilled by the facts before us. The checks here had passed beyond the control of the accused; he had no claim to them; and their reacquisition depended on the wishes of the payees to whom they have been uttered. Thus, instead of constituting communications to the lawyer by his client, Marrelli, the checks came into the former's possession from sources totally unrelated to that client and in no sense agents of his. As matters of independent knowledge on the part of the lawyer, and including only information derived from persons and sources other than the accused, the checks were completely outside the attorney-client privilege. See e.g., In re Ruos, 159 Fed 252 (DC Pa); King v. Ashley, 179 NY 281, 72 NE 106; Roberts v. Metropolitan Life Ins. Co., 94 F2d 277 (CA 7th Cir); Rediker v. Warfield, 11 FRD 125; Wigmore, supra, § 2317.

The accused's agent, Mr. Johnson, called upon various merchants in Panama City for the purpose of reimbursing them and of obtaining possession of the checks allegedly uttered by accused. Without disparaging in any manner the value of his efforts—or the value of lawyers' services in bad check cases—we may safely say that his function in *this particular* was ministerial in character, and demanded neither legal training nor ability. In other words a non-lawyer could have served the accused's purposes here as fully as a lawyer could have done. Accordingly, we are impressed by the analogy of the present case to those decisions which deny the protection of the privilege were the lawyer's connection with information, concerning which it is sought to cause him to testify, is entirely dissociated from his capacity as an attorney, and independent of services on his part as such. For example, if a businessman were to employ an accountant or a rental agent, he is unable to claim the protection of the privilege, should it turn out fortuitously that the accountant or the agent is in fact a licensed attorney. Thus an attorney is amenable to subpoena to produce documents such as checks, deposit slips, passbooks, and the like, which entered his possession in the course of routine business transactions for an accused, and the acquisition of which by the attorney was unconnected functionally with the rendition of legal services. United States v. Chin Lim Mow, 12 FRD 433. And in at least one jurisdiction the attorney-client privilege does not extend to money or property received by an attorney for his client, since the lawyer in this aspect is deemed to be acting for his client in a capacity indistinguishable from that of any other agent of the latter. Monticello Tobacco Company v. American Tobacco Company, 12 FRD 344.

The accused, himself, could well have performed the services involved here—and so could his mother. Had he done so, of course, he would have risked refreshing the recollections of prospective witnesses concerning his identity. Also, he would have subjected himself to an inference that, since he had taken up the checks, it had been he who had uttered them originally. And further inferences might have arisen from their nonproduction at the trial. Wigmore, supra, § 2273(2). Too, the accused might have employed one other than an attorney for the purpose. Undoubtedly such a person could have been compelled to tell all that he had done and observed at the time and, upon proper service of a subpoena duces tecum, to produce the checks, if he possessed them. That the

accused should be permitted to avoid such consequences by employing a lawyer to do that which either he, or any other non-lawyer, could have done with equal competence seems a result not demanded by the rationale of the lawyer-client privilege.

From the foregoing it will be evident that we have concluded that the attorney-client privilege was not infringed through Mr. Johnson's voluntary surrender of the checks to Lieutenant Smith, and by the reception at the trial of photostats of them. What if the lawyer had not delivered the documents to the Lieutenant voluntarily? In an analogous case an attorney was forced to testify concerning an allegedly forged note which he had paid—presumably in behalf of his client. Jordan v. State, 65 Tex Cr 143, 143 SW 623. The court there—quite properly we think—indicated that a different result might have obtained had the attorney secured possession of the paper in question from his client rather than from third persons. A Federal court, too, concluded that it was proper, over objection, to require an attorney to identify the signature of a client on a document, although his familiarity with that signature had been occasioned by his professional duties. Hawley v. Hawley, 114 F2d 745 (CA DC Cir). In light of such holdings, we would ▆▆▆▆▆ ▆ be inclined to find no irregularity had Mr. Johnson been called as a witness and been compelled to relate the contents and amounts of the checks paid by him, and to identify, if he could, the signatures appearing thereon. However, he could not, we are sure, have been compelled to testify to the contents of any conversations held with Marrelli in connection with the payment of the checks. As to information concerning the former's disposition of the checks following surrender to him, we must confess to some doubt. At the same time, since it is arguable that taking up the checks was an act ministerial in nature, no good reason exists for distinguishing the status of Mr. Johnson from that of any nonlawyer utilized by the accused to perform the same task. Consequently, we tend to believe that the attorney

**284**

could permissibly have been required to testify to his disposition of the paper —in the same manner as any non-lawyer who had acquired it in the accused's behalf. Whether he could have been compelled through subpoena duces tecum to produce the checks themselves, had they remained in his possession, we shall consider later in these pages.

### IV

Although not specifically raised at any point by the defense, we suspect we should advert to the possible presence of a further privilege arising out of the attorney-client relation, which was recently the subject of consideration by the United States Supreme Court in connection with discovery proceedings and interrogatories under the Federal Rules of Civil Procedure. Hickman v. Taylor, 329 US 495, 91 L ed 451, 67 S Ct 385. There the Supreme Court stated that a privilege against compulsory disclosure will normally be recognized in connection with an "attorney's work product." By this the Court signified an intention to refer to information and documents unearthed through diligence of counsel. Apart from the circumstance that the Supreme Court's pronouncement concerned compulsory disclosure by a lawyer in civil litigation —and here we are dealing with a voluntary disclosure in the course of criminal proceedings—and the additional fact that the Supreme Court recognized the possibility of the exceptional situation, into which category the present case would doubtless fall, we do not believe an "attorney's work product" to have been involved in the case at bar. That term to us signifies effort which in some manner involved the professional competence and ability of an attorney, and does not apply to a "work product" consisting solely of dishonored checks—to achieve possession of which required monetary equipment rather than legal insight.

### V

Defense counsel at the trial contended that the documents obtained from the attorney in this case were secured through an unlawful search and seizure.

The Supreme Court has at times referred the right against unlawful search and seizure to the protection of the right of privacy as well as that of the privilege against self incrimination. Davis v. United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256; Boyd v. United States, 116 US 616, 29 L ed 746, 6 S Ct 524. The accused's privilege against self incrimination will be treated in a later division of this opinion. However, with respect to his right of privacy, we observe that the documents involved here were located in Johnson's Panama City office, a locus in which the accused wholly lacked proprietary interest. Thus we doubt his standing to complain that his privacy had been invaded unduly. Cf. Goldstein v. United States, 316 US 114, 86 L ed 1312, 62 S Ct 1000; United States v. De Vasto, 52 F2d 26 (CA 2d Cir). In any event, we fail to understand how a voluntary surrender of documents properly may be deemed to constitute either a search or a seizure. Any claim that implied coercion dictated the conduct of the civilian attorney seems farfetched. The only "coercion" which might conceivably have been present in the circumstances would have arisen—presumably—from Mr. Johnson's recognition as a lawyer that Lieutenant Smith, or some other person, might seek to obtain legal authority to search for the checks.

We have not sought to determine with precision what powers of search and seizure with respect ■■■■■■■ to the checks would have been possessed by Florida officials, had they elected to prosecute Airman Marrelli. However, it is to be noted that Rule 41 of the Federal Rules of Criminal Procedure authorizes the issuance of a warrant to search for any object or thing either "designed or intended for use or which is or has been used as the means of committing a criminal offense." Cf. 47 Am Jur, Searches and Seizures § 54. The checks involved in this case seem to us to constitute the very instrumentality by which the accused had committed numerous offenses of "larceny by check"[1]

---

[1] The Federal case interpretation of what constitutes the "means" or instrumentality for committing a criminal offense would, we believe, encompass the checks issued by the accused. The case of Marron v. United States, 275 US 192, concerned the right of police officials to seize a ledger and certain bills during the course of an arrest. The ledger and the bills—covering gas, water, light and telephone service—were considered by the Supreme Court to constitute items necessary to the maintainance of a saloon operated in violation of the National Prohibition Act. Cf. United States v. Lindenfeld, 142 F2d 829 (CA 2d Cir)—involving certain records of a physician. In Harris v. United States, 331 US 145, 91 L ed 1399, 67 S Ct 1098, the Supreme Court seemed to approve the validity of a search for certain stolen cancelled checks, which police suspected had been used in the forgery of another check. The forged check had passed through the mails and in interstate commerce, for which Federal offenses the accused was being arrested—pursuant to an arrest warrant—at the time the search of his apartment was conducted. The majority opinion viewed the cancelled checks as instrumentalities of the suspected offense and therefore a proper subject of search. It was said there that "this Court has frequently recognized the distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed." The Court emphasized that the case before it was not one "of search for or seizure of an individual's private papers." Incidentally, this last comment is especially significant in its relation to the case at hand, since we have emphasized that one of the factors placing the checks in suit beyond the ambit of the attorney-client privilege is that—in themselves—they lacked any element of confidentiality, and had been tossed by the accused voluntarily into the stream of commerce and out of his control.

Some cases appear to limit the "instrumentalities of crime" concept to those tools connected with the offenses with which the search was initially concerned. Therefore, instrumentalities for the commission of different

—one of the types of theft denounced by the Uniform Code of Military Justice, Article 121, supra. Thus, the offense would be "criminal" under Federal law.[2] Accordingly, a warrant, we think, might lawfully have been obtained to permit a search for the checks in suit. When consent to a search or seizure of goods is obtained for the reason that the acquiescent person believes with good cause that, unless he agrees, a warrant may and will be secured, we are unable to discern illegality in the inducement. So far as we are concerned, the search or seizure pursuant to that consent must be deemed untainted. We may add too that where, as here, a lawyer is the consenting party, it would seem insignificant whether a search warrant could in fact have been obtained. And so—the record being devoid of circumstances indicating that Mr. Johnson surrendered the

crimes may not be seized, even when discovered during the search. United States v. Poller, 43 F2d 911 (CA 2d Cir); United States v. Brengle, 29 F Supp 190 (DC Va). In the case at hand, however, that rule would have presented no difficulty had the law enforcement authorities been compelled to seek a search warrant. That warrant certainly could have described with particularity the crimes involved and exactly which instrumentalities were sought in connection with each offense. Accordingly, we must conclude that the issuance of a search warrant could have been brought squarely within the authority of Rule 41. United States v. Best, 76 F Supp 857 (DC Mass), aff'd 184 F2d 131 (CA 1st Cir), cert den 340 US 939.

The suggestion has been voiced that Rule of Criminal Procedure 41 is unconstitutional if given its plain meaning. According to this view, the right to seek and seize instrumentalities of crime is predicated on the necessity for venting *future* criminal uses of those "tools of crime." Cf. Gouled v. United States, 255 US 298, 65 L ed 647, 41 S Ct 261; United States v. Lefkowitz, 285 US 452. However, upon careful consideration of the numerous cases having to do with searches and seizures, we cannot derive therefrom the principle that the touchstone of the constitutionality of the search and seizure is the possibility that the object seized would be used for future crimes, or for the consummation of an incomplete offense. Certainly no such notion is made explicit in Harris v. United States, supra. Moreover, in many of the cases the objects sought or seized seem to have exhausted their criminal potentialities by the time of the search and seizure. Especially can this be said of those cases in which the search accompanied an arrest, for the arrest itself usually terminates the utility of

the "tools of crime"—at least in the hands in which they had proved to be dangerous.

Our concept is that the limitation of search and seizure to the instrumentalities of the offense was designed to avoid indiscriminate ransacking of the effects of the person whose dwelling is searched. The search must be limited to specifically described objects which bear close relationship to the commission of the offense, in that they were the means by which it was accomplished. The exploratory search for and general seizure of any paper, document or article which affords evidence that a crime has been committed, but which was not the means of committing it, is forbidden. Cf. In re Number 191 Front Street, 5 F2d 282 (CA 2d Cir); United States v. Snow, 9 F2d 978 (DC Mass); In re Ginsburg, 147 F2d 749 (CA 2d Cir). On the other hand, the search for and seizure of the "tools" by which the crime was committed, as provided in Rule 41 of the Federal Rules of Criminal Procedure, does not, we believe, involve "unreasonableness" within the purview of the Fourth Amendment.

However, if Rule 41 should prove to be unconstitutional—which, in light of its careful preparation and the circumstances of its adoption, we deem a dubious possibility—we shall relinquish to some other tribunal the opportunity to be the first to determine. See e.g., 18 USCA, Federal Rules of Criminal Procedure, page XVIII. Moreover, even if we were to conclude that a search warrant as to the checks in suit might not have been obtained lawfully, it would be difficult to believe that Mr. Johnson's surrender of the documents was any the less voluntary because—although a lawyer—he might have erred as to the law.

[2] The note of the Advisory Committee concerning Rule 41(b) described it as

checks involuntarily to Lieutenant Smith—we are required to dispose of the search and seizure point adversely to the contentions of the defense.

## VI

The applicability of the privilege against self incrimination gives us further pause. It is quite probable that the accused could not lawfully have been compelled to produce the checks in suit at the prosecution's behest through *subpoena*. Boyd v. United States, supra. However, had the checks been in his personal possession, rather than in that of his attorney, a warrant could presumably have been obtained to *search his effects* for these "tools of crime." Likewise, if it were believed that they were to be found on a military installation, a search might have been conducted as authorized by the Manual, supra, paragraph 152. Yet if the accused had initially paid the checks, had assumed possession thereof, and thereafter had delivered them to Mr. Johnson, we doubt that Mr. Johnson could have been compelled to produce them. See, e.g., Powell v. Commonwealth, 167 Va 558, 189 SE 433; People v. Minkowitz, 220 NY 399, 115 NE 987; Wigmore, supra, § 2307.

In many instances, a lawyer cannot properly furnish legal advice or services without consulting documents pertaining to his client's problems and in the latter's possession. The delivery of these documents by the client to the attorney is, in such instances, an incident of the client's communication of the facts of the problem to his lawyer.

Therefore, we believe that a purpose to safeguard the lawyer-client privilege necessitates a refusal to compel the lawyer to produce such documents through use of the process of subpoena. Of course, we can envision instances in which a client seeks to utilize his attorney as a depository for all his papers —that is, where the transfer is unconnected with the attorney's professional functions, but is based solely on the presence of superior facilities for preservation. Were such a showing to be made, we might well conclude that the attorney could be required to produce the documents in court pursuant to subpoena. In any event, we may reserve decision on this question.

It has been intimated, however, that the liability of an attorney to produce documents relating to a client must differ in terms of whether the latter, or a third person entirely dissociated therefrom, was the attorney's source of possession. See People v. Minkowitz, supra. Such a distinction seems especially germane to the case at bar. Already we have indicated that the acquisition of the checks by Mr. Johnson lay outside the attorney-client privilege, since it involved no communication by Marrelli to his legal counsellor. Nothing implicit in the policy of assuring that a lawyer should be permitted to obtain information concerning facts revelant to the performance of his professional task requires that Mr. Johnson be distinguished from any non-lawyer, who might have taken up the checks in suit. Our reasoning that the former's status as a member of the bar was quite

---

a restatement of existing law, to wit "18 U. S. C. A. former § 612." See 18 USCA, Federal Rules of Criminal Procedure, page 463. We note, however, that this section authorized a warrant to search for property which "was used as the means of committing a *felony*." (Emphasis supplied.) Certainly the term "criminal offense" in Rule 41(b)—on its face—goes far beyond "felony." In any event, we may observe that any instance of larceny by check in the military services is punishable by a *dishonorable discharge*, together with forfeitures and confinement. Manual for Courts-Martial,

United States, 1951, paragraph 127*c*. Another Manual passage would suggest that this fact places the offense in the "felony" category. Paragraph 76*a*(2). The Code itself permits punishment "as a court-martial may direct," but delegates to the President the authority to provide limitations thereon. Articles 121, 56. Perhaps any larceny would have qualified as a "felony" under the prior statute which set forth grounds for the issuance of a warrant. Certainly as a "criminal offense," so made by Federal authority, it falls within the aegis of Rule 41.

incidental to the chore he performed for the accused disposes of the question of whether he might be compelled to produce the checks in court. Since no policy distinguishes his status from the non-lawyer's in the present context, and since the non-lawyer could have been compelled, under authority of a subpoena duces tecum, to produce the checks in court, we conclude that Mr. Johnson likewise could have been required by legal process to produce them at the court-martial hearing. Naturally, if production could have been demanded, we discern no prejudice to any privilege of the accused's resulting from the reception in evidence of photostats of the checks after their voluntary surrender by the lawyer.

Although the accused testified that he had not authorized Mr. Johnson to deliver any of his documents to other persons, we are not at all sure that this action would not fall within the scope of the attorney's implied authority. Of course, an attorney does not possess authority to betray his client's secrets. Wigmore, supra, § 2307. However, he certainly may exercise implied authority to effect such disclosures as are incidental to negotiations in his client's behalf. And quite probably the surrender of the checks to Lieutenant Smith constituted a phase of an effort to facilitate the avoidance of criminal proceedings in the Florida courts through the return of Marrelli to Air Force authorities for whatever disposition they might deem appropriate.

More important, we believe that an attorney possesses implied power voluntarily to surrender objects in his possession, the locus of which is known to prosecuting authorities, and which, as "tools of the crime," would probably be subject to a legal search and seizure. In other words, we conclude that Mr. Johnson was authorized to cooperate with Federal authorities—in this case with the Air Force—to the extent of surrendering voluntarily the "bad checks" which, as previously developed, were probably otherwise subject to being sought and seized through use of a warrant. We doubt that the generality of attorneys would regard it as a condition

**288**

of employment in a criminal case that they refuse to surrender instrumentalities of crime, which had come into their known possession, or that they compel investigative officials to search their offices therefor under a search warrant. It is possible that a narrower approach to implied authority might be taken by us if the issue related to the authority of assigned military counsel. In the case before us, however, we are dealing with the authority of a civilian attorney voluntarily selected by the accused and his mother as the former's agent. We can discover in Mr. Johnson's surrender of the checks no breach of trust which might conceivably impair the admissibility of photostats of those documents.

### VII

In light of the foregoing, it follows that the determination of the board of review must be affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

The opinion of the Court, expressed through the words of Judge Brosman, is exhaustive and all-inclusive. There are, however, a number of principles announced which I consider of doubtful application in light of the meager evidence I find in this record. By way of illustration, there is good authority to the effect that, if a lawyer sets aside his legal cloak and is employed as an accountant, the information he obtains in that capacity is not privileged. On the other hand, if he is consulted as a counselor of law, the fact that he deals with accounts or accounting principles does not destroy the confidential relationship. Again, if an attorney is employed in the capacity of a real estate broker, communications made to him must be disclosed on the witness stand, but not so if the clients seek and obtain legal advice on questions arising out of real property transactions. My difficulty, in the instant case, springs from the lack of evidence to establish an attorney-client relationship, and as to whether the disclosure, if improper, occurred before or after the accused

claims to have employed Mr. Johnson as his counsel. For that reason, I prefer to base my concurrence on a narrow ground.

The principle of attorney-client privilege is an exception to the general liability of every person to give testimony upon all facts inquired of in a court of justice. Therefore, the party seeking to exclude the testimony should be required to produce facts which would render the evidence incompetent. In this instance, the most that was offered in that behalf is that at some time between the latter part of October 1952, and January 1953, the accused had an occasion to hire an attorney by the name of Johnson, officing in Panama City, Florida; that he never authorized the attorney to turn over to other parties any documents belonging to him; that he did not know when Johnson obtained the checks; and that his mother paid the bill. The checks amounting to approximately $250.00 were issued on the 14th, 15th and 16th days of October 1952, and they were repurchased from the various merchants in Panama City shortly after they had been returned for nonpayment. There were three victimized merchants who testified on the identity of the repurchaser—one stated the check was redeemed by Davenport and Johnson Law Association; one mentioned a Mr. Johnson; and, a third mentioned a local attorney.

From the foregoing meager presentation of facts, we are asked to conclude that the attorney obtained possession of the checks as a result of disclosures made by the accused while a confidential relationship existed between them. However, there are so many interstices in the evidence that for us to fill them in would require a major task of supplementation. I do not propose to mention all of the missing links as, for my purposes, two will suffice. The first gap in the evidentiary chain is found in the fact that the record does not establish the date the accused is supposed to have employed Mr. Johnson as an attorney. The obligations represented by the checks were satisfied shortly after the checks had been re-

fused by the bank, and it is entirely possible that the repurchasing transactions may have been completed before the accused consulted with Mr. Johnson or had any intent to employ him as a counselor. In that connection, it is to be noted that the accused testified his mother paid for the service performed, and it is more than a fair inference that she or some other third party advanced the funds to redeem the checks as accused's source of income had dried up. If the information came into the possession of the attorney from accused's mother prior to the time the claimed relationship was contemplated, then the knowledge he obtained concerning the checks would not be protected by confidentiality. Moreover, the accused testified he did not know when the checks were turned over to the attorney, and, for aught that appears, the checks may have been released to the representative of the Air Force before any contract of employment was negotiated by the accused.

In discussing a second fatal weakness found in the record, I will assume an attorney-client relationship has been established. Based on that assumption, we are faced with a situation where an attorney has released information concerning his client prior to trial. The question of importance then posed is whether the attorney exceeded his authority in making any disclosure. The reasons justifying him in doing so were never probed into, and, unless I desire to impute bad faith unto him, then I must conclude he had some reasonable basis for taking the action he did. Obviously a client can authorize his attorney to make a full and fair disclosure of any fact, and there are many good reasons which might justify a lawyer in releasing information concerning his client without exceeding his express or implied authority. The record is noticeably silent about the reasons for seeking Mr. Johnson's assistance, and he may have been directed to take any and all steps which might have a tendency to forestall prosecution by either state or Federal authorities. While the accused testified he did not authorize the counselor to turn any documents over to third persons, that

hardly denied he authorized the attorney to take such action as might be necessary to have the state authorities relinquish jurisdiction and return the accused to military control for possible disciplinary action. Neither does it deny that the attorney was authorized to negotiate with military authorities to have them request a release by the state. It is probable that there were some advantages which would accrue to the accused if the prosecution was channeled through military sources. If so, a showing that the obligations were fully paid and satisfied might influence military authorities to request the state to relinquish jurisdiction. In addition, it may have been necessary to make a full disclosure to escape prosecution by both the state and the Federal Government. Furthermore, the record shows this to be accused's first brush with the law; the transactions were closely related in time; and he was interested in remaining in the service. The evidence that accused had negotiated the checks, and that he could be identified, must have appeared compelling. Accordingly, a trusted and competent attorney might, in order to assist his client and without breaching his trust, properly establish that his client had committed an offense but had repented, had made restitution, and had righted his wrongs. By adopting those tactics he might further his client's chances of escaping prosecution. To support such a plan, the attorney could release supporting evidence. While in this case the attorney might have done less than release the checks temporarily, there is no showing he could; and there is not an iota of evidence in the record that he exceeded his authority in proceeding as he did. A finding to that effect is a necessary predicate to a conclusion that he breached a confidential relationship, and the finding must be supported by some evidence.

I have mentioned only two fatal deficiencies, one which undercuts the confidential relationship, and one which eats away the claim of an unauthorized disclosure. However, there are many others, and collectively they so weaken the understructure necessary to support accused's contention that it must fall.