UNITED STATES, Appellee

v

JOHN VIERRA, JR., Airman First Class,
U. S. Air Force, Appellant

14 USCMA 48, 33 CMR 260

No. 16,180

May 24, 1963

Major Charles K. Rush argued the cause for Appellant, Accused. With him on the brief were Colonel Daniel E. Henderson, Jr., and Colonel Joseph E. Krysakowski.

Captain Donald W. Brewer argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel Emanuel Lewis and Lieutenant Colonel Simpson M. Woolf.

## Opinion of the Court

QUINN, Chief Judge:

On March 10, 1962, a general court-martial in Okinawa acquitted the accused of a charge of forgery, but convicted him of eleven specifications of larceny by check from the Ryukyus Central Exchange, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and sentenced him to a bad-conduct discharge and confinement at hard labor for one and one-half years. The prosecution was based on the theory that, as part of a scheme to defraud the Exchange, the accused and a friend opened a checking account, with an initial deposit of $20.00, in the American Express Company Branch at Kadena, Okinawa, under the name of James V. Sinclair. In the next few days they cashed a series of checks, in the face amount of $45.00 and $50.00, at several branches of the Exchange. None of the checks were paid on presentment. The convening authority approved the findings of guilty of larceny, but modified the sentence by reducing the confinement to one year. A board of review affirmed.

At all stages of the proceedings, the accused contended that certain evidence used against him was obtained as the result of an illegal search of his off-base residence, and the illegal seizure of a card issued by a local coffee shop. First, he maintains that the warrant authorizing the search, which was issued by Judge Cyril E. Morrison of the United States Civil Administration Courts, Ryukyu Islands (USCAR), was invalid. Secondly, he contends the evidence did not constitute contraband or the instrumentality of a crime, so that even under a search warrant it was not subject to seizure.

The Ryukyu Civil Administration Court was created by order of the President. Executive Order No. 10713, June 7, 1957, 3 CFR (1954–1958 Compilation) 368. The accused contends

the order is an unconstitutional exercise of executive authority. As far as the administration of the Ryukyu Islands is concerned, the question is novel. Counsel for both the Government and the accused have thoroughly and ably briefed the point, and we appreciate the helpfulness of their briefs in marking out the lines of approach for our decision.

Okinawa, which forms the principal island in the Ryukyu chain, was taken from the Japanese armed forces in the "last [battle] of World War II." United States Army in World War II, The War in the Pacific, page 474 (1948). During combat operations, military government units carried out governmental functions in the areas under military control. *Ibid.*, pages 35, 83, 415–419; see also Steele, "A Treatise on the Government of The Ryukyu Islands" (1959) (unpublished), Army Library, Law Section. Cessation of hostilities did not end military government. Nor did military government end with the signing of the Treaty of Peace with Japan on September 8, 1951. Under the Treaty, Japan retained, what John Foster Dulles, the American delegate to the Peace Conference, called "residual sovereignty" over the islands, but it recognized, in the language of the Treaty, the existing right of the United States "to exercise all and any powers of administration, legislation and jurisdiction over the territory and inhabitants" until such time as the islands might be placed under the trustee system of the United Nations "with the United States as the sole administering authority." TIAS 2490, 3 United States Treaties and Other International Agreements 3172 (1952); "Conference for the Conclusion and Signature of the Treaty of Peace with Japan," Department of State Publication 4392, December 1951, page 78.[1] Appellant contends that the exercise of authority by the ■■■■■ ■ United States means, in the first instance, the exercise of authority by Congress. The President, he says, can only carry out

such laws as Congress may enact for the government of the islands; and, since Congress did not provide the basic authority for the establishment of USCAR, the President's action is unauthorized and unconstitutional. As a statement of the overall relationship between Congress and the Chief Executive in governing United States sovereign territory, the argument is generally sound. See Youngstown Sheet & Tube Co. v Sawyer, 343 US 579, 96 L ed 1153, 72 S Ct 863 (1952). However, the argument overlooks the basic fact that Congress took no action to change the character of the existing control of the islands, and there was no statute outstanding that operated in this area. In the absence of such action by Congress, or previous statute, the responsibility for administering the civilian government of the area remained with the President. Madsen v Kinsella, 343 US 341, 348, 96 L ed 988, 72 S Ct 699 (1952).

In a number of cases, the United States Supreme Court has considered similar situations. In each, it recognized, and upheld, the continuation of executive administration of the local government "until further action by Congress." Dooley v United States, 182 US 222, 234, 45 L ed 1074, 1082, 21 S Ct 762 (1901); see also Cross v Harrison, 16 Howard 164 (U. S. 1853); Santiago v Nogueras, 214 US 260, 265, 53 L ed 989, 29 S Ct 608, 609 (1909). The facts in the *Santiago* case are very similar to those in the present case. The plaintiff owned certain lands in Puerto Rico. These were sold to the defendant under an execution on a judgment obtained in a civil court which, with Presidential approval, was established by the American military authorities exercising control over the island as a result of the war with Spain. The court was created after cessation of hostilities and the signing of a treaty of peace with Spain. About a year later, Congress enacted legislation to govern the island. The plaintiff contended the judgment and the execution were void because the court which rendered the

[1] We need not attempt to define the precise legal attributes of Japan's "residual sovereignty" or the administra-

tive control powers of the United States. See United States v Wilmot, 11 USCMA 698, 29 CMR 514.

judgment had no legal existence. The United States Supreme Court rejected the argument.[2] In part, it said:

"By the ratifications of the treaty of peace, Porto Rico ceased to be subject to the Crown of Spain, and became subject to the legislative power of Congress. But the civil government of the United States cannot extend immediately and of its own force over conquered and ceded territory. Theoretically, Congress might prepare and enact a scheme of civil government to take effect immediately upon the cession, but, practically, there always have been delays and always will be. Time is required for a study of the situation, and for the maturing and enacting of an adequate scheme of civil government. In the meantime, pending the action of Congress, there is no civil power under our system of Government, not even that of the President as civil executive, which can take the place of the government which has ceased to exist by the cession. Is it possible that, under such circumstances, there must be an interregnum? We think clearly not. The authority to govern such ceded territory is found in the laws applicable to conquest and cession. That authority is the military power, under the control of the President as Commander in Chief." [Santiago v Nogueras, 214 US 260, 265, 53 L ed 989, 29 S Ct 608, 609.]

Turning to the warrant, the accused contends the rules of procedure under which it was issued are unconstitutional. Civil Administration Ordinance No. 144, titled "Code of Penal Law and Procedure,"

March 16, 1955, Section 1.4.2, provides that a warrant must be obtained "through a judge of a Civilian Administration or Magistrate Court" in order to "enter a private dwelling off a military reservation." The Ordinance empowers USCAR to promulgate rules of practice and procedure for the criminal courts of civil administration. Section 1.3.1., as amended by Paragraph i, Change No. 7, July 21, 1958. In discharging his obligation to govern the islands, the President could properly provide for the establishment of a legislative body, with authority to promulgate laws for the government of the local community. Cross v Harrison, supra; Leitensdorfer v Webb, 20 Howard 176 (U.S. 1858). Assuming, without deciding, that a legislative body of this kind is, like Congress, prohibited from delegating its legislative authority to another department of the Government (see United States v Sharpnack, 355 US 286, 2 L ed 2d 282, 78 S Ct 291 (1958)), it is proper to delegate to the judicial authority the right to promulgate rules of procedure in the courts. See Hawkins v United States, 358 US 74, 76, 78, 3 L ed 2d 125, 79 S Ct 136 (1958). Congress has delegated such power to the United States Supreme Court as to the rules of criminal and civil procedure, and similar authority has been extended to the state courts by state legislatures.

The accused's next contention is that, as a person in the armed foces, USCAR had no criminal jurisdiction over him; consequently, he argues, it had no power to issue the warrant. We need not examine the validity of the argument. Assuming the court had no jurisdiction over the person of

[2] Appellate defense counsel have called our attention to Ikeda v McNamara, Habeas Corpus No. 416–62 (DC DC). There the District Judge issued a writ of habeas corpus for a person being held for trial in the United States Civil Administration Courts Ryukyu Islands without indictment and without the prospect of a jury trial. As we interpret the proceedings in that case, they do not question the authority of the President to establish USCAR as the judicial branch of the civil Government for the Ryukyu Islands. Cf. Dooley v United States, 182 US 222, 234, 45 L ed 1074, 1082, 21 S Ct 762 (1901). Other than the Federal Rules of Criminal Procedure, we have not been referred to any specific domestic law that could apply to the Ryukyus. 18 USC § 3772, which provides for the rules of procedure, extends only to the United States district courts and the courts in the Canal Zone, the Virgin Islands, and Puerto Rico.

the accused, it had jurisdiction over the premises which were searched. Jurisdiction over the property is sufficient. See 79 CJS, Searches and Seizures, § 72a; cf. United States v Whitler, 5 CMR 458, 463, petition denied, 2 USCMA 672, 5 CMR 131. Going one step further, the accused maintains that the warrant itself is not sufficient authority for the search, but must, in addition, be supported by the express authorization of proper military authority. We rejected a simliar contention in United States v DeLeo, 5 USCMA 148, 157–160, 17 CMR 148.

We turn to the accused's final claim. He says the seizure of the coffee shop card was improper because the card is not contraband or an instrumentality of the crime, a characteristic which he maintains is required to give the Government the right to seize. See Gouled v United States, 255 US 298, 65 L ed 647, 41 S Ct 261 (1921); United States v Marrelli, 4 USCMA 276, 285, 15 CMR 276. The warrant recites that Airman First Class Thomas R. Burnell, a police officer in the Ryukyu Islands, made "complaint on oath" before Judge Cyril E. Morrison that in premises "#T–7, Tobari Housing Area" was "located and concealed" certain property "involved" in acts in violation of law, "to wit: Section 2.2.6, CA Ord 144 [forgery]" and that said property consisted of "Documents bearing the name of A/3c James V. Sinclair and/or Seril (sic) Number 61324, American Express Bank, Inc." The warrant also recites that the court was satisfied of the existence of the grounds of the application and that "there is probable cause to believe the same." It authorized search of the premises and seizure of "all such property hereinbefore specified." Authority to enter and search was to expire five days from the date of the warrant.

At trial, defense counsel maintained that the warrant was defective because it did not describe with sufficient particularity the place to be searched or the property to be seized. The objection was overruled. The ruling, in our opinion, was correct. On this appeal the objection is enlarged to include the present contentions. In Gouled v

United States, supra, the Supreme Court held that an executed contract was improperly seized under a warrant because it did not constitute an instrument of the crime. The Court noted that under some circumstances, an executed contract "might be an important agency or instrumentality" in the commission of the crime charged, but it pointed out that the certified questions which brought the case before the Court showed the Government had no interest in the contract "other than as evidence against the accused." Gouled v United States, supra, 310, 311; see also United States v Rhodes, 3 USCMA 73, 75, 11 CMR 73.

In a prosecution for larceny by check and forgery, a false document of identification can readily be used as a means to effect the crimes. United States v DeLeo, supra; United States v Marrelli, supra, at page 285. On one side of the card in issue is the name of the establishment, its advertising symbol, and the words "Coffee and Cake will be served free to the bearer of this card." The reverse side has a map showing the location of the shop in relation to other places, such as a theater and the police station. Written by hand on the face of the card is the name "James V. Sinclair, Jr." In my opinion, the handwritten insertion of the name on the face of the card gave it a potential for use as an identification card, and brought it within the class of documents described in the warrant. In fact, I can conceive of no other reasonable purpose for which the name would be inserted, especially in light of the admission by the accused's own handwriting expert that the person who wrote the name on the card was the same as the one who signed the checks. Therefore, I would affirm the conviction. However, my brothers are of the opinion that the card is merely an advertising lure, offering the bearer free coffee and cake. In their view, the addition of the signature did not change its character; therefore, they conclude the card did not come within the terms of the warrant, and was inadmissible as "mere evidentiary" material. See United States v Rhodes, supra, page 75;

52

Harris v United States, 331 US 145, 154, 91 L ed 1399, 1407, 67 S Ct 1098, 1103 (1947); United States v Rabinowitz, 339 US 56, 64, 94 L ed 653, 659, 70 S Ct 430, 434 (1950); see also 129 ALR 1296. Since the card was found in the accused's home, and tended directly to link him to the checks, my brothers consider its admission in evidence as prejudicial to the accused. Gouled v United States, supra.

The decision of the board of review is reversed, and the findings of guilty and the sentence are set aside. A rehearing may be ordered.

KILDAY, Judge, with whom Judge FERGUSON concurs:

I agree completely with the excellent analysis by the Chief Judge of the status of the Ryukyus Islands and the authority of the Administrative Court to issue a search warrant. However, for reasons set forth below, I do not agree that the coffee shop card, prosecution exhibit 12, was admissible in evidence.

The record reveals that the coffee shop card was no more than a medium of advertising and could not, within reason, be regarded as "a false document of identification [which] can readily be used as a means to effect the crimes."

A photostat of the card is contained in the record. On one side of the card are the printed words "Coffee and Cake will be served free to the bearer of this card"; the name of the establishment, Pierrot; and its advertising symbol. The reverse side contains the same advertising symbol along with a map reflecting the location of the coffee shop in relation to the theater, the Koza police station, and other sites in the immediate area. It does not purport to have been designed for issuance to any individual as there is no particular space on either side indicated for insertion of the name of the bearer. Actually, it appears to be nothing more than an ordinary business card containing an offer of free coffee and cake as an advertising lure.

It is on the side containing the free offer of sustenance that the handwritten name, "James V. Sinclair, Jr.," appears.

The search warrant, under authority of which the card was seized, also appears in the record. It was properly issued and granted authority to search for and seize "Documents bearing the name of A/3c James V. Sinclair." However, I do not believe that this description of the property can be construed to include the above-described card. The Fourth Amendment to the Constitution provides the right of people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures and directs that no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. The Supreme Court of the United States has led in circumscribing the objects of lawful search and seizure, at least insofar as the seizure of evidentiary articles is concerned, declaring that search warrants may not be used as a means of gaining access to a man's house or office solely for the purpose of searching to secure evidence to be used against him in a criminal proceeding. United States v Gouled, 255 US 298, 65 L ed 647, 41 S Ct 261 (1921); United States v Lefkowitz, 285 US 452, 76 L ed 877, 52 S Ct 420, 82 ALR 775 (1932). In this regard, there is firmly recognized a category of property customarily characterized as "mere evidentiary materials" which can never be made the subject of a lawful search and seizure. United States v Rhodes, 3 USCMA 73, 11 CMR 73; Harris v United States, 331 US 145, 154, 91 L ed 1399, 67 S Ct 1098 (1947); United States v Rabinowitz, 339 US 56, 64, 94 L ed 653, 70 S Ct 430 (1950). This protection is secured within the provisions of the Fifth Amendment to the Constitution, for in legal contemplation such search and seizure of private books and papers compels the owner to be a witness against himself by the most potent evidence—his writings and records. United States v Premises in Butte, Montana, 246 Fed 185 (D Mont) (1917); Gouled v United States, supra; Boyd v United States, 116 US 616, 29

L ed 746, 6 S Ct 524 (1886); Weeks v United States, 232 US 383, 58 L ed 652, 34 S Ct 341 (1914), LRA1915B 834, Ann Cas 1915C 117; 79 CJS, Searches and Seizures, § 64b, page 828; 47 Am Jur, Searches and Seizures, § 54. As stated by the Supreme Court in Davis v United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256 (1946), reh den, 329 US 824, 91 L ed 700, 67 S Ct 107 (1946) (conviction upheld on the ground that the papers seized (gasoline ration stamps) were not "private" but "public property" in the custody of a citizen):

> "The law of searches and seizures as revealed in the decisions of this Court is the product of the interplay of these two constitutional provisions. [Citing Boyd v United States, supra.] It reflects a dual purpose—protection of the privacy of the individual, his right to be let alone; protection of the individual against compulsory production of evidence to be used against him." [Again citing Boyd v United States; Weeks v United States, supra.]

A perusal of prosecution exhibit 12 leads me to the conclusion that, at the very most, the coffee shop card can only be construed as evidence which would support a conviction rather than the instrument or fruit of a crime.[1] In that connection, it is noteworthy that by stipulation, each of the individuals who cashed the checks in question testified that they "always check the I.D. card of the individual cashing the check." And, on the reverse side of each of the checks there appears the handprinted name "James V. Sinclair, Jr." and "AF 16581405." Clearly, the record does not reflect that the coffee shop card was used as a document of identification in cashing these checks.

I believe the state of case thus presented to be practically identical to the situation in United States v Gouled, supra. For the reasons stated by the Supreme Court in the last-mentioned decision, it was error to admit the coffee shop card in evidence.

As hereafter noted, the admission of the coffee shop card was prejudicial to the substantial rights of appellant. Therefore, it is not necessary that we consider the situation which might exist as to prejudice arising from the violation of a constitutional norm. Kotteakos v United States, 328 US 750, 90 L ed 1557, 66 S Ct 1239 (1946); Bruno v United States, 308 US 287, 84 L ed 257, 60 S Ct 198 (1939); and the Annotations in 1 L ed 2d 1735 and 4 L ed 2d 1833. The incriminating evidence offered by the prosecution consisted, in major part, of opinion testimony by a handwriting expert who, by comparison of admitted genuine signatures of appellant with the checks in question and the coffee shop card, came to the conclusion that the accused was the signator of the latter items. Likewise, the evidence offered in rebuttal, by the defense, was exclusively opinion testimony of a handwriting expert who arrived at an opposite conclusion.

In this state of the record, since the coffee shop card was the only evidence, *aliunde* the above-noted opinion testimony, associating the accused with these charges, its admission in evidence was prejudicial to his substantial rights. United States v Gouled, supra.

Accordingly, I agree with the disposition of this case as provided in the opinion of the Chief Judge.

---

[1] For a discussion of the distinction between papers or other articles which merely furnish evidence of crime and the actual instrumentalities of crime, see 129 ALR 1296.