UNITED STATES, Appellee

v

CARL H. BUCK, Master Sergeant, U. S. Marine Corps, Appellant

9 USCMA 290, 26 CMR 70

291

No. 2330

Decided June 6, 1958

*Donald A. Brown, Esq., Gerald J. Miller, Esq.,* and *Francis X. Quinn, Esq.,* counsel for Appellant, Accused.

*Major Charles R. Larouche,* USMC, counsel for Appellee, United States.

## Memorandum Opinion of the Court

Persistence is not the key to procuring this Court's consideration of a case. However, the volume and content of the pleadings submitted in this case by numerous and successive counsel over the years disclose many fundamental misconceptions; misconceptions of the facts upon which the conviction rests, of the proceedings had from the trial through completion of the appellate review, and of the jurisdiction of this Court itself. Accordingly, a final and definitive expression of our views on these matters is necessary.

Carl H. Buck, then a member of the Marine Corps, was convicted by general court-martial on August 19, 1952, upon a single charge of larceny of property of the United States of the value of $496. After approval of the findings by the convening authority a board of review set aside the conviction because it believed the evidence failed to establish that the element of taking was accompanied by a trespass *as a matter of law.* This determination was challenged by The Judge Advocate General of the Navy by certificate submitted in accordance with Article 67b(2), Uniform Code of Military Justice, 10 USC § 867. We reversed the decision of the board of review on September 11, 1953, and our reasons are reported in 3 USCMA 341, 12 CMR 97. Thereafter,

upon further proceedings directed by this Court, the board of review re-examined the record and concluded, *as a matter of fact,* that it established the accused's guilt beyond a reasonable doubt. It, therefore, affirmed the sentence. Within the time specified by Article 67(c) of the Code, supra, the accused filed a petition for grant of review as authorized by Article 67(b)(3) of the Code, supra. On October 4, 1954, when full review of the record disclosed no error prejudicial to the substantial rights of the accused, we concluded that the absence of "good cause shown" precluded a grant of review. Accordingly, we denied his petition.

On October 7, 1954, within the time fixed by Rule 46 (*a*) of the Rules of Practice and Procedure promulgated by this Court, the accused filed a petition for reconsideration of that action. After granting two extensions of time to afford counsel additional opportunity to prepare supporting briefs, we considered his petition and arguments. Finding they presented absolutely nothing of a meritorious nature, we denied reconsideration December 10, 1954. Immediately thereafter, a further petition for reconsideration was submitted and was similarly disposed of. On January 2, 1957, a document entitled "Motion to Reopen" was received.

**292**

We returned it to counsel without action.[1]

We are now asked to reopen these proceedings by motion submitted by new counsel. While the statutory authority relied upon for such a pleading is not disclosed directly, counsel seem to rely exclusively upon the provisions of Article 67(b) of the Code. This provides:

"(b) The Court of Military Appeals shall review the record in—

(1) all cases in which the sentence, as affirmed by a board of review, affects a general or flag officer or extends to death;

(2) all cases reviewed by a board of review which the Judge Advocate General orders sent to the Court of Military Appeals for review; and

(3) all cases reviewed by a board of review in which, upon petition of the accused and on good cause shown, the Court of Military Appeals has granted a review."

Obviously, Mr. Buck cannot be brought within the scope of subsection (1) or subsection (2). His only possible basis for review is to be found in subsection (3). But this provision must be read in conjunction with Article 67(c) which provides:

"(c) The accused has 30 days from the time when he is notified of the decision of a board of review to petition the Court of Military Appeals for review. The court shall act upon such a petition within 30 days of the receipt thereof."

Taken together, these clear directives afford an accused a right to review by this Court, first, if his petition is filed within thirty days of the receipt of the decision of the board of review, and, second, if good cause is shown. As indicated above, the only petition filed under these provisions has been denied.

Assuming the All Writs Act, 28 USC § 1651(a), permits us to extend relief under extraordinary circumstances there is no basis for the exercise of such power in this case. On the basis of the evidence of record three independent fact-finding tribunals were convinced beyond a reasonable doubt of the accused's guilt. No fact or error of law is now advanced to cloud the accuracy of these findings.

The record of trial shows that the accused attempted to enlist the aid of Master Sergeant Rankins, whom he knew slightly, in his endeavor to procure a large quantity of chevrons. Rankins pointed out the area in which the supply activities of Camp Pendleton were conducted. Immediately thereafter, the accused entered a survey warehouse in that area, and, after inconsequential preliminaries, asked Sergeant Hatley, who was on duty there, to "get him some Chevrons out of the Clothing Section." According to Hatley, the accused said "he wanted . . . half a case of Summer Corporal, half a case of Winter Corporal, and half a case of Sergeant Chevrons . . . he told me that he would give me $50.00 or $25.00 and a case of whisky or $25.00 for each person if it took two people to take the Chevrons from the building and that he would give each one of them $25.00 for these Chevrons." Hatley suggested that the accused telephone him two days later to see whether or not he had been able to make the appropriate arrangements. When the accused left, Hatley reported the matter to his superiors who in turn discussed the situation with the Depot Legal Officer. Hatley was instructed to inform the accused that all was in readiness. On March 7, 1952, in accordance with their original understanding, the accused telephoned Hatley who conveyed the suggested information to him. At

---

[1] Despite the provisions of Article 76, which provides for finality of courts-martial judgments, we note that numerous collateral efforts have been made by the accused to obtain reconsideration of his case. Subsequent to our final consideration of the accused's original petition for review, the punitive discharge was executed. Thereafter, the character of the discharge was changed administratively to a general discharge under honorable conditions. See 10 USC § 1052.

noon, on the same day, the accused again arrived at the warehouse, saying: "I brought you a half a hundred." Three cases of chevrons were removed from stock and put at the door of the warehouse. The accused removed them to his car covering them with a robe. He then gave Hatley $50 declaring: "We're both making money on them."

While these acts were in progress, Master Sergeant Layton, by pre-arrangement, observed the transaction from a vantage point within the ware-house. At the trial, however, he was unable to identify the individual involved with Hatley.

Another observer was Master Sergeant Franz, an investigator from the office of the Provost Marshal. His identification of the accused was un-qualified. He testified that after the chevrons were moved "I started out of the building and as I started out I run right smack into Buck face to face, and Sergeant Hatley. I didn't want to put Buck under arrest at that time. I didn't have him in the car with the chevrons. I went down off the platform and turned around and I saw Sergeant Buck hand Hatley some money. I pro-ceeded to my jeep and as my jeep was facing in a different direction from Ser-geant Buck's car. I went down the road, oh, I would say about fifty yards and turned my jeep around and as I was coming back up, Sergeant Buck was coming off the platform beside me, jumped in his car, spun his wheels and took off. . . . [W]ithin a few miles Buck had left me as if I hadn't even moved." When an attempt to intercept the accused at the main gate failed, Franz proceeded to the Oceanside Police Department where the California High-way Patrol was alerted. Officer Duran of that Patrol stopped a vehicle answer-ing the description supplied by Franz. The accused was the operator. He was returned to military custody. After compliance with Article 31, Franz ques-tioned him. The results of this inter-rogation are best described in the lan-guage of Franz himself:

". . . First Buck said, 'What chevrons?' I said, 'The chevrons that I, myself, saw you put in your car.'

Then I asked him if he remembered me going by him in the warehouse— as I was going out the door, he was coming in, and he didn't answer. Then he told me afterwards . . . he said, 'I don't want to get in any trouble now. I'm on the Warrant Officer List. I've got a good chance of making it and he said, 'I'll tell you what you want to know.' I said, 'All right, Buck, let me know where the chevrons are.' He said, 'I went as far as the Post Nursery after I got the chevrons in my car. I transferred the chevrons to a black Chevrolet. The man's name is Tech Sergeant Blackman. I did duty with him in two or three different stations.' I asked Buck if he could give me his first name, and to what organization. 'I don't know. I met him onetime when I was up here drinking in the club.' I started to trace down a Blackman. There were no Black-mans.

. . . . . .

"Well, after I told him there was no such a person as Blackman, . . . I had him sitting right at my desk there and I was using the phone and all the locaters. He told me if I would give him a chance he would go to the club and meet this man, Ser-geant Blackman. That was the next day he was supposed to meet this man. I then told Buck I had no al-ternative but to confine him in the stockade and that I would make ar-rangements the next day to let him out and go down and make this con-tact with this Blackman who was sup-posed to have the chevrons. The next day which was the 8th of March, I went down to the stockade—or, not the stockade—13—G–1, saw a Mas-ter Sergeant Buck . . . never had seen me before, never remembered talking to me, didn't know who I was, didn't know what I was talking about."

The accused informed Franz that he wanted to get in touch with his wife so that she could obtain the services of an attorney for him. Franz advised Mrs. Buck and she visited the accused. Three days later the accused was released

from confinement to return to his organization. Upon release he, together with his attorney—Mr. Stevens, an associate of Mr. Daubney—appeared in Franz' office. According to the latter, the following then transpired:

"Buck was asking me what was going to become of this case and I told him there would have to be a complete investigation and that although I didn't have the chevrons at that time, we were still going to proceed with the case. Buck then asked me what I was going to do with his fifty dollars and about that time Mr. Stevens almost went through the railing to get over to Buck to tell him to keep his mouth shut."

This witness further testified that on March 18 or 19, 1952, he received a telephone call from Attorney Daubney, counsel for the accused, and was told that Daubney "had some government property—naming these chevrons that I was looking for and I told him that was right, I am missing some government chevrons. He told me I could have the same if I would come down and sign a receipt that I received them." In response to this call Franz proceeded to Daubney's where "many chevrons" were turned over to him.

That portion of this witness' testimony relative to the accused's question about the return of his $50 was corroborated to some extent by Staff Sergeant O'Keefe who was present. O'Keefe testified simply that he heard Buck ask Franz "something about fifty dollars."

"TC: At this time, Mr. Law Officer, the government would like to call Mr. Daubney, defense counsel, to the stand.
"DC: I have no objection.
"LO: Do I understand you to say you have no objection to being called?
"DC: No objection to being called as a witness.
"LO: You may take the stand."

Questioned by the trial counsel, Attorney Daubney then described the manner in which he obtained the chevrons in question in the following language:

". . . I received a telephone call—I think I can safely say it was not from Sergeant Buck because I would recognize his voice. A person asked me what they should do if they had some government property. So I said, 'Turn it into the government.' As I recall, he then asked me if I would do it for them. I said, 'Certainly, bring 'em up.' I don't recall whether the person told me he had chevrons or not, or whether they just had government property. I honestly don't remember. That evening, I think I received a telephone call in the afternoon, as I recall, . . . that evening the chevrons were found by me either in my outer office or in the hall. I can't figure out whether I picked them up in the hallway or whether I found them in the outer office and I can't remember. So I looked in the blanket, saw what they were, hauled them down to the library, dumped them in the library, and either called the military police or tried to get Mr. Scanlon. I couldn't get him. I talked to Sergeant-Major Franz. It was either that evening or the next morning that I called at the Camp and told them I had this gear and to send someone in to get it. I felt—still feel—that any time that it comes to our attention that there is some government property that I should do everything within my power to make certain it is returned to the United States government."

At the close of the prosecution's case, defense counsel moved for a finding of not guilty, contending that the facts in evidence did not establish larceny because the element of trespass was lacking. The motion was denied. As indicated by our opinion, cited above, this ruling was perfectly proper.

Although the accused did not testify, witnesses called on his behalf by the defense testified that on the date fixed by Sergeant Hatley as the date on which the accused first proposed the illicit transaction Sergeant Buck was at the Marine Corps Recruit Depot in San Diego; hence, that he could not have been at Camp Pendleton where the crime allegedly occurred. Another wit-

ness placed the accused at a garage at Oceanside, California, shortly before the time the prosecution witnesses asserted he was at the supply warehouse. The testimony of Officer Duran of the Highway Patrol was calculated to show that the accused could not have traversed the distance from Camp Pendleton to Solana Beach—approximately fifteen miles—within the time limits fixed by the testimony of the various witnesses.

Finally, by accentuating the discrepancies in the description of the individual dealing with Hatley, the defense sought to show that the accused was the victim of mistaken identity.

The foregoing facts were submitted to the court-martial under proper instructions. Our review of this record indicates that the tribunal's resolution of the single issue of guilt or innocence was predicated on substantial evidence —the testimony of eyewitnesses and unrebutted admissions of the accused which approximate confessions of guilt. There was ample basis in the record for the court's rejection of the defense arguments relating to time, distance and identity. The accused particularly stresses the purportedly short interval of time between the pickup of the chevrons and his apprehension as indicating that it was physically impossible for him to cover the distance involved. However, according to the prosecution's evidence, the time was not nearly so short. A substantial period elapsed between the time Sergeant Franz pursued the accused after the pickup and the telephone call to the Highway Patrol. We are, therefore precluded from further review of the facts. Article 69 (d), Uniform Code of Military Justice, 10 USC § 869; United States v Stewart, 1 USCMA 648, 5 CMR 76; United States v Schultz, 1 USCMA 512, 4 CMR 104; United States v Taylor, 5 USCMA 775, 19 CMR 71; Wilcoxon v United States, 231 F2d 384 (CA 10th Cir) (1956).

With the evidence of record clearly before us, we turn now to an examination of the assignments of error upon which our reconsideration is sought.

The appearance of the trial defense counsel as a prosecution witness is the subject of three separate assignments. Our discussion shall be limited to the first of these, for the validity of the other depends wholly upon its strength. Trial counsel's conversion of Attorney Daubney from a defense advocate to a witness for the prosecution, it is argued, is "tantamount to a denial of due process of law."

From time immemorial it has been the general rule that confidential communications between attorney and client in the course of professional employment are privileged and cannot be used in evidence against the client. The rule, however, does not make the attorney, as attorney, incompetent as a witness under any and all circumstances. So, when the facts concerning which his testimony is sought have been obtained from third parties, there is no basis upon which the privilege can be invoked. In re Ruos, 159 Fed 252 (ED Pa) (1908). A similar situation exists when the communication was made with the understanding that it was to be imparted to third parties. In re Fisher, 51 F2d 424 (SD NY) (1931); Wilcoxon v United States, supra.

In the instant case, after establishing a theft of Government chevrons by the accused, the prosecution showed that a large quantity of chevrons were recovered at the office of the accused's attorney. Trial counsel then called the attorney who declared he had no objection to appearing. We will not invoke a waiver upon this declaration, but shall consider the testimony he supplied. This testimony relates to representations made to him by someone unknown to him. But he did know that such person was *not the accused*. Thus, all the evidence in this record even remotely touching the subject of the recovery of chevrons was wholly unrelated to any confidential relationship. Viewed realistically, when Sergeant Franz testified to the receipt of chevrons from the defense counsel, answering generally the description of the property described in the specification, an inference would be drawn immediately that counsel ob-

**296**

tained them from the accused. It certainly was to the advantage of the accused to have this inference dispelled as soon as possible. Under the circumstances, Mr. Daubney's willingness to appear as a witness is not only understandable but is entirely consistent with sound trial practice. An argument that his presence on the witness stand deprived the accused of his counsel during the period he was testifying is at once dismissed as unworthy of consideration.

Contentions that the accused was denied a speedy trial, and was illegally confined after the board of review finally affirmed his conviction, are wholly lacking in merit. The right to a speedy trial is readily enforceable by appropriate application prior to trial. Moreover, a failure to assert it at the trial level precludes its consideration on appeal. Certainly, it should not be given any weight when urged several years after trial, and after the sentence has been served. United States v Hounshell, 7 USCMA 3, 21 CMR 129. A similar conclusion is required by the contention regarding improper confinement. Assuming such confinement affected the merits of the accused's appeal—a circumstance which is neither argued nor independently observed—it should have been urged when the original petition was submitted.

It is next argued that the accused's pretrial admissions should not have been received by the trial court for there was no showing that Government property was missing, or that chevrons were taken. The testimony of Sergeants Hatley, Franz and Layton prove the contrary. From their statements it may safely be concluded that when the accused declared he had transferred the chevrons to a black Chevrolet at the Post Nursery, and when he later sought a return of his fifty dollars, he was not referring to an offense which never occurred. United States v Evans, 1 USCMA 207, 2 CMR 113; United States v Leal, 7 USCMA 15, 21 CMR 141.

An asserted misstatement of fact in our previously reported opinion, supra, is wholly disposed of by reference to that opinion.

A final assignment groups a number of claims said to establish a basis for holding that the cumulative effect of numerous errors requires reversal. These include: an attack on the validity of a pretrial recommendation, to which no objection was made at trial (United States v McCormick, 3 USCMA 361, 12 CMR 117); an attack on the general sufficiency of evidence upon which we have expressed our conclusion above; and other contentions considered insignificant.

Since its establishment this Court has had but one primary aim—to insure that every person tried by court-martial is accorded a fair trial. As early as United States v Clay, 1 USCMA 74, 1 CMR 74, we declared:

"There are certain standards in the military accusatorial system which have been specifically set by Congress and which we must demand be observed in the trials of military offenses. Some of these are more important than others, but all are of sufficient importance to be a significant part of military law. We conceive these rights to mold into a pattern similar to that developed in federal civilian cases. For lack of a more descriptive phrase, we label the pattern as 'military due process' and then point up the minimum standards which are the framework for this concept and which must be met before the accused can be legally convicted. *The Uniform Code of Military Justice, supra, contemplates that he be given a fair trial and it commands us to see that the proceedings in the courts below reach that standard.*" [Emphasis supplied.]

The record conclusively demonstrates that every standard demanded by the Uniform Code of Military Justice was met at all stages of the proceedings. Analyzed in the light of the record, each assignment of error now urged is unfounded in fact and without legal foundation.

The terminal point, which all litigation must eventually have, was reached and passed more than three years ago.

**297**

Accordingly, the instant motion is denied.

Judge FERGUSON did not participate in the decision in this case.