UNITED STATES, Appellee,

v.

Edith A. BABAT, Specialist Four, U.S. Army, Appellant.

No. 45,077.
SPCM 15471.

U.S. Court of Military Appeals.

Aug. 6, 1984.

For Appellant: *Captain William T. Wilson* (argued); *Colonel William G. Eckhardt, Colonel R. Rex Brookshire II*, and *Captain Rita R. Carroll* (on briefs); *Captain David M. England*.

For Appellee: *Captain Thomas E. Booth* (argued); *Colonel James Kucera* and *Lieutenant Colonel John T. Edwards* (on brief); *Colonel R. R. Boller*.

## Opinion of the Court

EVERETT, Chief Judge:

A special court-martial in Korea convicted appellant, contrary to her pleas, of receiving and concealing stolen property and of conspiracy to conceal stolen property, in violation of Articles 134 and 81, Uniform Code of Military Justice, 10 U.S.C. §§ 934 and 881, respectively. She was sentenced to a bad-conduct discharge, confinement and forfeiture of $299.00 pay per month for 4 months, and reduction to the lowest enlisted grade. The convening authority approved the trial results, and the Army Court of Military Review affirmed in an unpublished opinion. This Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING THE PROSECUTION TO ELICIT STATEMENTS MADE BY THE DEFENSE COUNSEL TO A GOVERNMENT AGENT PRIOR TO TRIAL.

### I

#### A. *Pretrial Proceedings*

Babat was tried on two charges. Charge I alleged a violation of Article 81, to wit: that ... [she] did, at Seoul, Korea, between October 1979 and November 1979, wrongfully conspire with Chief Warrant Officer Four John P. Daum, US Army, and Mrs. Martha A. Daum, his wife, to commit an offense under the Uniform Code of Military Justice, to wit: wrongfully concealing stolen United States currency, of a value of about $120,000.00, the property of the United States government, which property, as they, the said Edith A. Babat, John P. Daum and Martha A. Daum, then knew, had been stolen, and in order to effect the object of the conspiracy the said Edith A. Babat, John P. Daum and Martha A. Daum, did invest some stolen money in a Korean company, did pass some stolen money at a Korea Area Exchange facility, did purchase a van with stolen money, *and did turn in some stolen money to the government while concealing the remainder to negotiate for immunity*, said offense occurring outside the territorial limits of the United States.

(Emphasis added.) Charge II, which was laid under Article 134, contained these two specifications:

Specification 1: In that Specialist Four Edith A. Babat, US Army, 19th Adjutant General Detachment (Postal), did, at Seoul, Korea, between October 1979 and November 1979, unlawfully receive United States currency, of a value of about $120,000.00, the property of the United States government, which property, as she, the said Specialist Four Edith A. Babat, then well knew had been stolen, said offense occurring outside the territorial limits of the United States.

Specification 2: In that Specialist Four Edith A. Babat, US Army, 19th Adjutant General Detachment (Postal), did, at Seoul, Korea, between October 1979 and November 1979, unlawfully conceal United States currency, of a value of about $120,000.00, the property of the United States government, which property, as she, the said Specialist Four Edith A. Babat, then well knew had been stolen, said offense occurring outside the territorial limits of the United States.

When the court convened on August 7, 1980, appellant was defended by detailed defense counsel, Captain Thomas Devlin, and by individual military counsel, Captain Edward Camblin. One of the first preliminary matters considered by the judge was

a government request "that the military judge sever the relationship between individual defense counsel, Captain Camblin, and the accused, Specialist Babat." In support of this request, trial counsel explained that Captain Camblin had "important information" which "the Government feels, one way or the other must go before the jury as part of the case in chief." This information related to $25,000.00 in currency and other items which came into his possession "by way of attorney-client relationship" and which Camblin delivered to Special Agent Robert Davis of the Criminal Investigation Division (CID), who was conducting an investigation. As trial counsel also pointed out, Captain Camblin had one version and Special Agent Davis another of the conversation accompanying the delivery of the money.

The defense position was that evidence concerning this conversation was inadmissible in any event—thereby undercutting the ground for the Government's request to sever the attorney-client relationship. Indeed, the defense had filed a motion *in limine* seeking to prevent trial counsel "from eliciting any testimony from any witness concerning any remarks or utterances" by Captain Camblin when he relinquished a sum of money to Special Agent Davis on November 26, 1979.

As to the evidentiary issue, the court ruled:

> The court will permit Agent Davis to testify as to the act of recovering the money from Captain Camblin. It appears, however, that anything Captain Camblin said in the course of turning that money over to Agent Davis would be hearsay. Accordingly, Agent Davis would not be permitted to testify as to anything said to him by Captain Camblin during that transaction. However, if Captain Camblin were to testify as to that conversation, it would not be hearsay, and since the conversation apparently was a conversation between Captain Camblin and the CID agent, a third party, that conversation is not protected by

any privilege. Accordingly, Captain Camblin would be permitted to testify, if called, as to the contents of that conversation. Of course, the court would not permit any questions or answers by Captain Camblin on any privileged areas such as anything going beyond the conversation that took place with Agent Davis since that was the only part that was not covered by the privilege. As to additional questions concerning the source of the money or the identities of clients would not be permitted [sic].

Having decided that the individual military counsel could be called by the Government as a witness, the judge inquired whether Captain Camblin wished to withdraw and received a negative reply. Next, the judge explained in detail to appellant that if Captain Camblin remained as her counsel, she might be prejudiced in some way: the "panel members may see Captain Camblin testifying as a government witness and then see him sitting at your table and they may connect you in some way to the testimony which he has given." Similarly, as the judge explained, Camblin's testimony might be given less weight if he appeared as a defense witness in a trial where he was also serving as defense counsel. Despite the judge's thorough explanation, Babat decided that she "wish[ed] to keep Captain Camblin as my attorney." Thereupon, the judge—with proper deference to *United States v. Piggee,* 2 M.J. 462 (A.C.M.R. 1975)—declined to sever the attorney-client relationship between appellant and her individual defense counsel.

During a subsequent Article 39(a)[1] session, the defense moved to strike the words "to negotiate for immunity" from the overt act in the specification alleging conspiracy. Its contention was that under Fed.R.Evid. 410—which renders certain plea-negotiations inadmissible in evidence—the Government should not be allowed to establish that any of the overt acts alleged in Charge I was related in any way to immunity negotiations. The military judge disagreed and denied the motion.

---

1. Article 39(a), Uniform Code of Military Justice, 10 U.S.C. § 839(a).

## B. *Evidence at Trial*

When the presentation of evidence on the merits began, the first government witness was Captain Joseph Legato, Jr., commander of the 19th Adjutant General Detachment (Postal), the organization responsible for "[p]rocessing all mail coming in for units here in the Yongsan area." In September 1979, a shipment of money by the Finance and Accounting Officer to the Federal Reserve Bank of San Francisco had been stolen while being handled by Legato's organization. The shipment consisted of about a thousand hundred-dollar bills, an equal number of fifty-dollar bills, and some ten-dollar bills. The money—all in one package—had been signed for by a clerk, PFC Jeanne Fink, who was assigned to the detachment; but "it was never dispatched" to its destination. Some of the records relating to the shipment also "had mysteriously disappeared." This "theft was [ultimately] discovered on" November 16, 1979, "when the Finance and Accounting Officer came to" Legato "to try to determine what had happened to this particular shipment of money." Later that day, a CID agent had come "over ... to interview personnel related to the mail room activities in the Registered-Mail Room." At that time, the detachment had about 54 people, one of whom was appellant. Another female servicemember, PFC Ramona Pohl, had worked in the registered-mail room, but she left in mid-October for Fort Jackson, South Carolina.

At the time of the theft, Babat "was authorized to live off post and she was living with a warrant officer and his wife by the name of Daum." As a postal clerk, she was in a position to know that money was routinely sent back to the United States, and she was familiar with the forms and procedures used in the registered-mail room.

Special Agent Davis testified that he "was the primary investigator" of the September-1979 theft from the postal unit. On November 19, Mr. Davis interviewed Babat, who was not then a suspect. However, PFC Pohl, who had already made a permanent change of station from Korea, was suspected. Babat related to Davis that Pohl had "left a note with $250 for her [Babat] to send some of Ramona Pohl's personal items to her in the States, using that $250 to do that." Babat had "indicated" to Special Agent Davis "that she believed Pohl" had stolen the currency shipment from the mail room. On Sunday, November 25, as a result of some information he had received, Special Agent Davis conducted a further interview with Babat, "during which she indicated that she had evidence or conclusive evidence against Pohl."

Upon examination by the judge, Special Agent Davis explained that, under Army currency regulations applicable to Korea, a "currency turn-in slip" must be prepared when an individual uses a $50 or a $100 bill. Prior to his first interview of Babat, Davis had found a turn-in slip signed by Babat which listed the serial numbers of four $50 bills which she had turned in and which stated that "PFC Mona Pohl" was her "source of acquisition." The serial numbers of these bills corresponded to the numbers of four $50 bills shown on a list Davis had received of the currency in the stolen mail shipment.

Pursuant to an immunity grant,[2] PFC Fink testified that she was the receiving and dispatching clerk for registered mail in the mail room from which $160,000 had been stolen in September 1979. However, she did not learn about the theft until November 16. According to her, "every other day or every three days we received shipments of money from FAO-K going to the Federal Reserve Bank in San Francisco," where the currency was "to be destroyed or" placed "back into circulation in the States." There was general knowledge about these shipments among the members of her unit.

2. The week before, Fink herself had been convicted by a court-martial "of stealing $1,000 of the stolen money from PFC Pohl" and had "received a bad conduct discharge, suspended, four months' hard labor, bust to E-1, forfeiture of $298 for four months."

PFC Fink had signed for the package of money. Since hers was the last signature on a document recording the whereabouts of the package and also because there was a record of her having cashed some of the stolen bills, she was a leading suspect in the theft. As a result of some information that she received from Specialist Mary Iseral on November 25, Fink talked with appellant, who

> told me that she was in her house, was playing with the teddy bear, that the teddy bear was supposed to have been— had—was in some of the stuff that belonged to PFC Pohl that Specialist Babat and Sergeant [sic] Iseral were to have shipped to Pohl in the States. And she was playing with the teddy bear; she found a tear along the seam of the teddy bear, picking up the threads, came to find out that there was money in the bear; that the amount of money was $120,000; that they had invested money in an optical company in bonds.

Fink understood "they" to be Babat "and the Daums." Babat related that she "had found the money and that she was going to end up going to jail because she had stolen the money from Pohl, instead of sending it to her in the bear."

PFC Fink had been Pohl's roommate and "had stolen $1,000 from" her. As this money was itself part of the $160,000 which Pohl had stolen, Fink continued to be the leading suspect in the theft from the mail room. She testified:

> When I discovered that Babat had had 120,000 of it, I thought that maybe that would help clarify things as to the fact that I didn't have all the money and that it would also show the fact that Pohl had had the money, but it turned out that between November and April it was still—that I was under suspicion for the whole 160,000 and—well, Babat and I both were, for having stolen 160,000. And so during that time we talked about it all the time actually trying to find out what ... each other knew.

At one point, Babat told PFC Fink "that she could account for all the money but

$30,000 of it"; and, concerning a Korean optical company in which "some of the money was supposed to have been invested," Babat made statements indicating that "nobody can prove what company" "[o]r if there was a company."

Later, however, "between April and May," appellant changed her account; and, according to PFC Fink,

> she started to tell me a little bit of a story here that she wasn't the one that had found the money. She told me that ... Mrs. Daum had found the money and that—that they had found $25,000 that she had turned in to her lawyer as soon as she found it.

PFC Fink testified that she had been with her roommate, Pohl, on September 28, 1979, when Pohl bought a teddy bear which she planned to give to her four-year-old daughter upon returning to the United States. On October 10, Pohl left Korea.

Specialist Five Mary Iseral testified that she had performed several clerical functions within the post-office facility. In November 1979, she was interviewed by the CID—as were others—about the $160,000 theft, which had just come to light. Iseral and Babat not only worked in the same unit but also were very good friends. On November 25, Iseral was with Babat, who "seemed a little upset" and who finally told her that Mrs. Daum "was shaking the teddy bear and had—a $100 bill had popped out of it, and, to my knowledge, it was $120,000 she said that they had found." Babat explained to Iseral that "she thought it was black-market money" and had decided at the time "to keep it." However, Iseral responded to appellant "that there was actually no way an individual could— you know, could make $120,000 in one year in Korea. I—I don't care what they do; it's impossible as far as I'm concerned." Babat "agreed" with this comment; and then she told Iseral "that she was going to talk to someone the next day; she didn't say who, you know, what they were, or, you know, their names or anything." Before that, Babat "mentioned that Mr. Daum was going to take some of the mon-

ey back to stateside and put it in a bank account for her. But then she realized that it wasn't black-market money," as she had originally believed. After these disclosures, Iseral had said, "Stop. I don't want to hear any more."

Later in the day, after reflecting on the information she had received, Specialist Iseral began to worry about "what happens if somebody knows that I know what she told me; I could probably be in trouble for withholding evidence." Therefore, even though she considered Babat to be her "best friend," Iseral went to Captain Legato, the company commander, and said, "I think I know where some of the money is." Then she talked to Special Agent Davis, who had interviewed her previously.

On cross-examination, Specialist Iseral testified that she had known Mona Pohl and in October of 1979 had been her guest for an evening of dining and gambling. At that time, Iseral had no suspicion that there had been a theft at the post office. She was aware, however, that Pohl was spending a great deal of money and was in possession of about $2,000 in money orders. On November 19, Iseral had been questioned by Special Agent Davis "about Mona Pohl and her spending activities"; and Babat had been questioned on this same date. Iseral inferred from her conversation with Babat on November 25 that, when the money was found in the teddy bear in October, Babat "did not know it was stolen," but "thought it was black-market money at first"; and not until November 25, when they had talked, did Babat realize that the money was stolen.

Iseral had assisted Babat in moving the belongings that had been left by PFC Pohl—a teddy bear was among those belongings. Also, she had seen a note that Pohl had left "to the effect... 'I hope you found the $250 I left you.' "

Colonel William Fritts, commander of the 501st Military Intelligence Group, testified that in November 1979, Chief Warrant Officer Daum was a member of his organization and had returned to the unit around November 23, 1979, from temporary duty and leave in the United States. At that time, Fritts was unaware of the larceny from the post office. On November 24, Mr. Daum met with Colonel Fritts and told him "about having just come into a considerable, large sum of money"—"around $100,000, something of that nature." Daum told Fritts that he had found the money in his house in a teddy bear, which had been left there by a girl along with some other items for shipment. Daum had described how his wife found the money in the teddy bear, which they "thought ...was black-market money being shipped out of country." They had decided to keep the money; but later, when Daum was back in the States, he had been called by his wife and told that it was stolen government money. At this point in their discussion, Colonel Fritts told Mr. Daum that he had no choice except to return the money.

Fritts "got the feeling" that Mr. Daum had "spent enough" of the money "that he knew he was in trouble if he had to produce it right away and he didn't have all of the assets to return." Daum told him that he had purchased a van while back in the States and had invested some of the money in a Korean optical shop; but that about $20,000 or $25,000 was left. Mr. Daum had not mentioned Babat's name to Colonel Fritts, but he had "mentioned another soldier, a young soldier—I believe he said Spec Four—living there at the same apartment."

Special Agent Davis was recalled and identified $25,000 in fifty-and hundred-dollar bills, a teddy bear, and some items of clothing that he had received on the morning of November 26, 1979, from Captain Camblin. Subsequently, in April 1980, he had received 29 million won in Korean currency from Captain Culpepper, a judge advocate assigned to the Administrative Law Section of the 8th Army JAG office in Korea. At the rate of exchange prevailing in October 1979, the Korean currency would have been worth about $60,000; but at the rate prevailing at the time of trial the value was $12,000 to $15,000 less.

At a side-bar conference trial counsel informed the judge of his "intention to call Captain Camblin to the stand to testify" about the "conversation ... that took place" when he delivered the $25,000 to Mr. Davis. Subsequently, Camblin testified as a government witness that, when he handed over the money and the teddy bear, he told Special Agent Davis:

Client or clients unknown gave me privileged communications, led to the discovery; it may possibly be of use in an ongoing investigation. I certainly don't want to keep it. Here it is.

According to Camblin, "the word 'immunity'" came up in this conversation

in context that my client or clients unknown had information which may be useful to the Government in leading to the recovery of certain allegedly stolen money. These client or clients unknown are unwilling to come forward unless they knew that their testimony would not be used against them in a court of law; accordingly, they would not be willing to testify unless they were so promised that they would not—their testimony would not hurt them, i.e., unless they were given immunity. I conveyed that to Mr. Davis.

However, Camblin denied emphatically that he had indicated that his clients had money which they did not own but which they "would not release ... unless they had immunity." He explained:

We made the distinction between the proceeds of the stolen money and the stolen—allegedly stolen money. Any stolen money that my client or clients had was evidence and had to be released immediately to the police, which it was.

Camblin added that

the gist of what I said was that my client or clients were not willing to say anything unless the Government promised that what they said wouldn't be used against them. So, in other words—and I think I made that clear to Mr.—or I tried to make it clear to Mr. Davis; he seemed to understand me at the time; and it was a very short conversation; and he depart-

ed, since he was evidently not in a position to offer any type of immunity anyway.

According to Camblin, he had used the word "immunity" in the conversation to refer to "testimonial immunity, not transactional."

Special Agent Davis, recalled once again, gave this version of the lawyer's remarks:

During our conversation he stated something about the money that he was turning in, the $25,000, being a show of good faith in return for immunity for his clients and that if his clients got immunity, it could lead to the recovery of more money or more of the money would be returned, something to that effect.

According to Davis, Camblin indicated that the return of the money was "[a] good faith gesture."

The Government's case closed with the stipulated testimony of the sales manager of a Chevrolet dealership in Yakima, Washington. He recalled that Chief Warrant Officer Daum had purchased a recreational van on November 15, 1979, and had paid $11,068.95 in hundred-dollar bills.

Appellant was the sole witness for the defense. She described PFC Pohl as "a call girl" who reportedly "was very active in the black market amongst other things." Moreover, Pohl had "stayed frequently at" various luxury hotels. On one occasion, Babat and Iseral had been Pohl's guests for dinner and shows. When Pohl returned to the United States around October 9 or 10, "[s]he gave ... [appellant] $250 to mail her personal belongings ... located ... [i]n the Eighth Army female barracks," where Pohl roomed with PFC Fink. Among the belongings was a teddy bear which Babat kept "because I had fell [sic] in love with it."

At that time, Babat was living in the same apartment with Warrant Officer Daum and his wife, Marty. She referred to them as her "adopted parents," although there had never been any formal adoption. After Babat had put the teddy bear on the living-room couch in the apartment,

my adopted mother was playing with it, and she found a hole in the seams and she—my mother has the thing for holes so she kept on picking at the hole and it got bigger and she felt something hard. She was curious because the teddy bear should not be stuffed with something hard. So she was feeling around in it and she had taken out some of the stuffing, and she found some money in it. At the time, appellant believed that the money—about $120,000—belonged to PFC Pohl; and she was unaware of any robberies or "other type of criminal activity that would have netted a great deal of money." The money had been found in the teddy bear about October 13 or 14; and Babat had mailed Pohl's belongings to her on the afternoon of October 15. On November 17 or 18, Babat became aware of the larceny of the government property. Thereupon, she immediately called Mr. Daum, who was in the United States, and gave him this information. At that time, "he said not to talk to anybody, to wait until he came back." Therefore, she had been unwilling to sign a statement for Special Agent Davis before her "father" returned.

When Mr. Daum got back, he talked to Colonel Fritts on Saturday, November 24; and "we were to go see a lawyer Monday morning." Appellant denied that she and her "adopted parents" had ever agreed to conceal the stolen money. Despite extensive cross-examination, she insisted that initially she believed the teddy bear contained "black-market money," rather than stolen money. Moreover, as soon as the true source of the currency came to light, she and her "adopted parents"—with whom she had divided the funds—took steps to return all of the money that was still in their possession. She "was present" "when that $25,000 was turned over to somebody"—this being, to the best of her knowledge, the remainder of the $120,000 found in the teddy bear.

After appellant left the stand, the Government presented brief rebuttal evidence. Then counsel made their arguments, and the judge offered extensive instructions to the court members, who found Babat guilty as charged.

## II

Both at trial and on appeal, appellant has argued that the statement by Camblin was inadmissible. However, our consideration of the issue leads to a different conclusion.

### A. *Relevance*

By the point in the trial when the Government offered Davis' testimony about his receipt of $25,000 in currency and a teddy bear on the morning of November 26, 1979, substantial evidence already had been presented that in mid-October Babat and the Daums had found $120,000 in fifty- and hundred-dollar bills stuffed in a teddy bear. This teddy bear belonged to PFC Ramona Pohl, who worked with Babat in the mailroom from which $160,000 had been stolen; and it had been among the personal belongings that Pohl left with Babat around October 10 for shipment to the United States. On November 25, Babat, who "seemed a little upset," had told her good friend, Specialist Iseral, "that she was going to talk to someone the next day" about the situation. At some time "between April and May," Babat told PFC Fink "that she had turned in [$25,000] to her lawyer." Consequently, few could doubt that the $25,000 in fifty-and hundred-dollar bills and the teddy bear which Captain Camblin, an Army judge advocate, delivered on the morning of November 26 to Special Agent Davis, "the primary investigator" of the mailroom theft, had been received by Camblin shortly before from Babat or the Daums.

Agency, like other relationships, may be established by circumstantial evidence. When Camblin delivered to Davis stolen property which he had just received from Babat or the Daums, the circumstances shown by the government evidence tended to establish that the attorney was acting for Babat or the Daums. Indeed, the evidence about the relationship of Babat and the Daums, and the manner in which the stolen money had come into their posses-

sion, tended to prove that Camblin was acting for all three of them.[3] If Babat had walked into Davis' office and returned some of the stolen property, this evidence would have been relevant to the charges against her. It is no less relevant that she had her agent, Captain Camblin, return the money.

The same logic applies to the statements made by Camblin while returning the money. If those statements had been uttered by Babat, they would have been relevant to show that she had knowledge about the theft from the mailroom and the disposition of the stolen property. The relevance of the statements is not diminished because they were made by her representative, Captain Camblin.

## B. *Hearsay*

■ Analysis of the relevance of Camblin's statements also makes clear that Davis' testimony about those statements was not barred by the hearsay prohibition—although in ruling on the defense motion *in limine* the military judge took a contrary position. If those same statements had been made by Babat herself, they would have constituted admissions by a party and so would have been received in evidence. The result is not altered because Babat acted through an agent. Under the law of agency, a principal may be held criminally or civilly liable for the acts of an agent within the scope of his authority. The vicarious liability for the acts of a co-conspirator acting pursuant to the conspiracy is another example of the same basic principle.

■ In similar fashion, the statements someone makes through an authorized agent are imputable to the principal and may be admitted in evidence against him. Thus, the provisions of the Manual for Courts-Martial in effect at the time of trial

allowed use in evidence against an accused of "[a] translation made by an agent of the accused," para. 141, Manual for Courts-Martial, United States, 1969 (Revised edition), and of statements made by co-conspirators "in pursuance of the conspiracy," para. 140*b*, Manual, *supra*. Thus, if Camblin was acting as an authorized agent of Babat in his discussion with Davis, his remarks could be used against her.

The same circumstantial evidence that would indicate that the lawyer had been representing Babat and the Daums in delivery of the stolen property to Davis would show that his utterances were also on their behalf. Certainly, it would be a reasonable inference that Camblin had been authorized by appellant and her confederates to say something to Davis—rather than be a mere delivery boy.

Furthermore, under one interpretation of their meaning, the statements by Camblin were not hearsay, because they were not being offered by the Government to prove the truth of any matter that Camblin had asserted.[4] Instead, the statements by Camblin, who was acting as an agent, constituted an implicit offer by Babat to trade information for immunity; and the very fact that the offer was made tended to prove that she and her alleged co-conspirators, the Daums, were concealing the remainder of the stolen money in order "to negotiate for immunity," as alleged in Charge II.

## C. *Attorney-Client Privilege*

Camblin's statements to Davis were not part of any conversation between an attorney and his client. Moreover, there is no indication that any disclosures implicit in these remarks resulted from "perfidious conduct on the part of a faithless attorney." *See United States v. Marrelli*, 4 U.S.C.M.A. 276, 282, 15 C.M.R. 276, 282 (1954). Instead, all the evidence tends to

---

**3.** Babat's own testimony, given later in the trial, also supports the inference that Captain Camblin was representing both her and the Daums.

**4.** According to the Manual provision then in effect:

A statement which is offered in evidence to prove the truth of the matters stated therein, but which was not made by the author when a witness before the court at the hearing in which it is so offered, is hearsay. *See* para. 139*a*, Manual for Courts-Martial, *supra*.

show that Camblin's delivery of the $25,000 to Davis and his statements at that time were made within the scope of his representation of Babat and the Daums and so were not protected by the attorney-client privilege.

■ Under the ruling by the military judge as to the defense motion *in limine*, Davis was barred on hearsay grounds from testifying about Camblin's comments when he delivered the $25,000; but Camblin himself could be called to testify about the conversation. An attorney is competent to testify in a trial of his client, even though he may be called as a witness by some other party. For example, in *United States v. Buck*, 9 U.S.C.M.A. 290, 26 C.M.R. 70 (1958), the accused's lawyer was called as a witness for the Government. *See also United States v. Marrelli, supra.*

■ Of course, when a lawyer foresees that he may be called to testify—whether for a client or adversely to him—he should consider withdrawal from the case in order to avoid either having to argue the credibility of his own testimony or prejudicing the client in some way. However, this principle is not unvarying, *see* Disciplinary Rule 5–102, American Bar Association Model Code of Professional Responsibility, February 1980; and, under the circumstances of this case, we certainly do not criticize Captain Camblin for continuing to serve as individual defense counsel—especially since his client requested this after receiving a thorough explanation from the judge of the possible adverse consequences.[5]

### D. *Evidence of Offer by Accused*

During an Article 39(a) session preceding trial, appellant had contended unsuccessfully that language in Charge I about negotiations for immunity should be stricken. At the time, the Military Rules of Evidence had not yet taken effect; so the defense could not rely on Mil.R.Evid. 410, which renders inadmissible pleas of guilty later withdrawn, offers to plead guilty, or statements in connection with such pleas or offers. However, as to cases tried prior to these Rules, this Court has sometimes applied the Federal Rules of Evidence in deciding evidentiary issues not dealt with in the Manual for Courts-Martial. *See United States v. Johnson*, 3 M.J. 143 (C.M.A. 1977). Therefore, on appeal, the defense has again invoked Fed.R.Evid. 410, which states in material part: [6]

> Except as otherwise provided by Act of Congress, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal action, case, or proceeding against the person who made the plea or offer. This rule shall not apply to the introduction of voluntary and reliable statements made in court on the record in connection with any of the foregoing pleas or offers where offered for impeachment purposes or in a subsequent prosecution of the declarant for perjury or false statement.

Appellate defense counsel argue that, even though Camblin's remarks were not linked to any plea or offer to plead, they should be viewed as being "made in connection with" an implicit offer to plead, and Davis should be treated as an agent of the prosecutor to receive this offer. *Cf. United States v. Grant*, 622 F.2d 308 (8th Cir. 1980). Moreover, pointing to public policy, they contend that, to allow reception in evidence of Camblin's remarks to Davis will have a "chilling effect" in the future on offers to provide information to the Government, because the prospective offeror will fear that his offer of information will be used in evidence against him.

■ We recognize the importance of maintaining the flow of information to law-

---

5. Furthermore, the detailed defense counsel, Captain Devlin, could handle any matters at the trial as to which Camblin might feel inhibited by his role as a witness.

6. *See also* Fed.R.Crim. P. 11(e)(6).

enforcement authorities and do not wish to impede that process in any way. However, we are sure that Camblin's discussion with Davis did not constitute plea negotiations within the contemplation of Fed.R.Evid. 410. *See, e.g., United States v. O'Brien,* 618 F.2d 1234, 1240–41 (7th Cir.), *cert. denied,* 449 U.S. 858 (1980); *United States v. Pantohan,* 602 F.2d 855, 857 (9th Cir. 1979); *United States v. Robertson,* 582 F.2d 1356, 1366 (5th Cir. 1978)(en banc). Under the bifurcated test announced in *Robertson,* the accused must have subjectively expected "to negotiate a plea at the time of the discussion, and" that expectation must have been "reasonable." Neither requirement is satisfied here. There is no indication in the record that Babat expected plea negotiations to occur at that stage. In fact, according to Camblin, he was only concerned at the time with obtaining "testimonial immunity." Moreover, any expectation that plea negotiations were being undertaken at that time was objectively unreasonable. *Cf. Rachlin v. United States,* 723 F.2d 1373, 1376 (8th Cir. 1983). Davis was an investigator—not a trial counsel or a convening authority. Indeed, as Camblin himself later testified at trial, Davis "was evidently not in a position to offer any type of immunity anyway."

If Davis had made an express or implied promise of confidentiality with respect to any statements by Camblin, a different situation would confront us. However, no such promise is indicated in the record. We also observe that, according to the allegations of Charge I, Babat and the Daums were concealing the remainder of the stolen money in order "to negotiate for immunity." If evidence were excluded of any offer to exchange stolen property for immunity, it would be difficult—often impossible—to prove such allegations. While the difficulty of proving a charge without certain evidence does not demonstrate that the evidence is admissible, it does raise a question in our minds as to whether Fed.R.Evid.

410 or any other rule of evidence ever contemplated the exclusion of comments like those made by Camblin.

### E.  *Prejudice*

We observe that the testimony of Captain Camblin dealt only with one of the overt acts alleged under the conspiracy charge. From our reading of the judge's instructions to the members, it appears that appellant could not have been convicted under specification 1, Charge II, which alleged receiving stolen property, unless the court members found that, at the very time the currency was found in the teddy bear, appellant believed it was stolen property.[7] It does not appear that Camblin's remarks contributed in any way to the court-martial's finding that Babat was guilty of receiving stolen property; but, in light of that finding and the other evidence, it appears clear that appellant would have been found guilty of all of the other overt acts alleged under Charge I, even if there had been no testimony about Camblin's conversation, and therefore, no basis for finding that, when the $25,000 had been returned, other stolen property had been concealed as a means to obtain immunity. Thus, even if the contested evidence had been excluded, Babat would not have been materially aided. The only effect would have been to eliminate one of several overt acts that were alleged; and we are sure that this would not have altered the sentence.[8]

### III

We conclude that reception of the evidence of which appellant complains was not error; and, even if it had been, no prejudice to appellant would have resulted.

The decision of the United States Army Court of Military Review is affirmed.

Senior Judge COOK concurs.

Judge FLETCHER concurs in the result.

---

7.  In light of Babat's position and her knowledge of the routine shipments of currency, there were ample grounds· for the court-martial to make such a finding.

8.  Perhaps it is more than a coincidence that Babat received almost the same sentence that PFC Jeanne Fink testified she had received. *See* n.2, *supra.*